**Glenn A. BUSCH, Administrator of the Estate of Gary S. Busch, Plaintiff,**

v.

**The CITY OF NEW YORK, Sergeant Terrance O'Brien, Sergeant Joseph Memoly, Officer William Loshiavo, Officer Daniel Gravitch, Officer Martin Sanabria, Defendants.**

No. 00 CV 5211(SJ).

United States District Court,
E.D. New York.

Sept. 9, 2004.

Beldock, Levine & Hoffman LLP, By Myron Beldock, Cynthia Rollings, Vera M. Scanlon, New York, for Plaintiff.

Cochran, Neufeld & Scheck LLP, By Barry C. Scheck, Nick Brustin, New York, for Plaintiff.

Corporation Counsel of the City of New York, By Jennifer Rossan, Kanika Juneja, Alan Scheiner, New York, for Defendants.

## MEMORANDUM AND ORDER

JOHNSON, Senior District Judge.

On November 19, 2003, after a four week trial and six hours of deliberation, a jury rendered a verdict finding Defendants Sergeant Terrence O'Brien ("Sgt. O'Brien"), Sergeant Joseph Memoly ("Sgt. Memoly"), Officer William Loshiavo ("Loshiavo"), Officer Daniel Gravitch ("Officer Gravitch"), and Officer Martin Sanabria ("Sanabria") not liable on all federal and state claims arising out of the shooting death of Gary S. Busch ("Busch").[1] Plaintiff Glenn A. Busch ("Plaintiff"), administrator of the Estate of Busch, moves pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law against Sgt. O'Brien, Sgt. Memoly, and Gravitch, and a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure against Sanabria and Loschiavo, or in the alternative, a new trial against all Defendants. Plaintiff further moves for post-trial juror interviews and a hearing to determine whether an extraneous influence tainted the jury deliberations. As described herein, Plaintiff's motion for a new trial is GRANTED against all Defendants on the excessive force shooting claim. The remaining motions are DENIED.

## FACTUAL BACKGROUND

Plaintiff filed the instant 42 U.S.C. § 1983 action against Defendants alleging, amongst other things, violations of Busch's right to substantive due process under the Fourteenth Amendment and his right to be free from excessive force under the Fourth Amendment, as well as state law claims for assault and battery. These claims arise out of an incident which began with two calls to Busch's residence, a basement apartment located at 1619 46th Street in the Borough Park neighborhood of Brooklyn, New York. On August 30, 1999, around 5:40 p.m., police officers first responded to a call that Busch was an emotionally disturbed person ("EDP") who needed medical assistance. Finding further police action unnecessary, the police officers left the scene without taking Busch to the hospital. Around 6:40 p.m. on the same evening, police officers responded to a second call that Busch was threatening his neighbors with a hammer. The officers' response to that second call culminated in Busch's death.

The trial involved the testimony of thirty fact witnesses, five defendants, and four expert witnesses. With respect to the first call to the police, civilian witnesses Yosef Horowitz ("Horowitz"), David Spira ("Spira"), and Issac Landau ("Landau") testified regarding their impressions of Busch's behavior prior to and after the officers' arrival. The police officers who responded to the radio call— Guy Scavelli ("Scavelli"), Nicolas DeRobertis ("DeRobertis"), James Derkash ("Derkash"), Sgt. Andrew Nyhan ("Sgt. Nyhan"), Sgt. O'Brien, and Kieran O'Leary ("O'Leary")— testified regarding Busch's behavior after they arrived on the scene. With respect to the second call to the police, Defendant officers and civilian witnesses Rafael Eisenberg ("Eisenberg"), Lazar Eichenstein ("Eichenstein"), Hershel Kaufman ("Kaufman"), Tzvi Rokeach ("Rokeach"), Jose Olivo ("Olivo"), David Templar ("Templar"), David Tyberg ("Tyberg"), and Lipa Ionovitch ("Ionovitch") testified regarding the events leading up to the shooting. In addition to expert witnesses, Officer Thomas Accardo ("Accardo"), Shimon Charach ("Charach"), Ari Goldstein ("Goldstein"), Officer Michael Esposito ("Esposito"), and Officer Michael Sweeney ("Sweeney") testified regarding events after the shooting. Although it is impossible to fully present all four weeks of testimony, the

---

1. Plaintiff's initial complaint contained additional plaintiffs, defendants, and federal and state law claims. The case proceeded to trial only against Defendant officers and the City of New York on substantive due process, excessive force, assault, and battery claims.

## 84

Court has attempted to recapitulate the relevant testimony in order to portray what took place on August 30, 1999.

### I. First 911 Call

On August 30, 1999, Horowitz observed Busch sitting "outside naked [in a] towel," (Aff. of Vera Scanlan, Ex. A. Trial Transcript ("Tr.") at 182) with his "feet [up] in the air." (Tr. at 184.) Horowitz informed Spira and Landau, members of the Shomrin, a neighborhood patrol organization, of the situation and the three of them traveled to Busch's residence. (Tr. at 185.) They encountered Busch and asked if he was on medication. According to Spira, Busch stated that he was a doctor and did not need medication. Busch further stated that he was smoking marijuana (Tr. at 116), hallucinating (*Id.*), and meditating (*Id.*) Both Spira and Landau testified that they smelled marijuana. (Tr. at 120, 150.) Busch also stated that he had previously been hospitalized in a psychiatric home and needed medical help. (Tr. at 185, 186.) Spira called 911, asked for emergency medical services ("EMS"), an ambulance, and informed the operator that Busch was an EDP. (Tr. at 117–18.) Spira testified that Busch then stood up and began to dance. (Tr. at 119.) After the 911 call, Busch eventually retreated into his apartment. (*Id.*)

At various intervals, Scavelli, DeRobertis, Derkash, Sgt. Nyhan, Sgt. O'Brien, and O'Leary responded to the 911 call. Busch's behavior once the officers arrived is in dispute. Spira and Landau testified that they immediately updated the officers (Tr. at 120, 150), and Horowitz specifically disclosed Busch's requests for help. (Tr. at 185.) According to Spira, Busch, who emerged from his apartment fully dressed, was noncompliant with the officers' requests and demonstrated signs of EDP behavior. Specifically, Busch rebuffed the officers' requests to stand up, stating "I didn't ask you what to do." (Tr. at 122.) Busch also refused the officers' request to call Percy Freeman ("Freeman"),

his African–American acquaintance who was in the apartment at the time, out of his apartment, stating that "when God tell[s] me[,] I'll be ready to take him out of the apartment, he will come out of the apartment." (Tr. at 188.) Freeman finally emerged from the apartment and handed Busch a flute, which Busch began playing in the presence of the officers. (Tr. at 122–23.) Spira and Landau recalled that Freeman also appeared to be under the influence of drugs. (Tr. at 123, 154.)

According to Landau, one of the officers stated to Freeman, "Skippy, what's up?" (Tr. at 154.) Landau recalled Busch offering a sergeant his hand, but the sergeant refused, stating, "I don't want to touch your [fucking] hand." (Tr. at 151.) Spira also recalled that one of the officers looked as if he were going to push Busch, but another officer stopped him. (Tr. at 124.) The police eventually left the scene without taking any action. As they were leaving, Spira testified that one of the officers explained that "they [didn't] want to call EMS because they have to send [another] officer with them. They didn't have an extra officer." (Tr. at 126.) Spira and Horowitz recalled that the police officers told Busch that if they had to come back, they would arrest him. (Tr. at 136, 189.) Landau stated that Busch screamed back: "you don't tell me what to do. I will tell you what to do. I'm above the police." (Tr. at 155.) Horowitz testified that Busch also screamed: "talking to me is like talking to God and talking to God is like talking to me." (Tr. at 189.)

In contrast, the officers testified that Busch appeared calm and did not act like an EDP.[2] Sgt. Nyhan, who was one of the first to arrive and interacted with Busch the most, testified that Busch was "very calm" (Tr. at 787) and spoke "very clearly." (Tr. at 773.) Sgt. Nyhan recalled Busch telling him that he did not wish to go to the hospital and that none of the civilian witnesses told him otherwise. (Tr. at 763, 768.) Freeman also told

---

2. Specifically, O'Leary testified that Busch appeared very relaxed, very calm, and wasn't loud or boisterous. (Tr. at 940). Scavelli testified that Busch was not acting in an irrational manner. (Tr. at 223.) DeRobertis testified that Busch was "calm and passive." (Tr. at 350.) Derkash

testified that Busch was "soft-spoken and calm." (Tr. at 382.). However, when confronted with his Civilian Complaint Review Board ("CCRB") interview, he acknowledged that he previously stated that Busch seemed "a little bit off centered and weird." (Tr. at 363.)

him that "everything was fine and that there weren't any problems." (Tr. at 763.) Sgt. Nyhan testified that he did not smell marijuana and that Busch obeyed his requests. Sgt. Nyhan determined, after speaking to Busch, Freeman, and the civilians, that no further police action was necessary. (Tr. at 791–92.) Sgt. Nyhan testified that they had no basis to arrest Busch. (Tr. at 764.)

Sgt. O'Brien testified that he did not question Busch, Freeman, or any of the civilians. When he arrived, Sgt. O'Brien observed Busch seated fully clothed with a flute between his legs. (Tr. at 2020.) Sgt. O'Brien testified that no one informed him that Busch was sick and needed medical assistance. (Tr. at 2025). As he was leaving, Sgt. O'Brien confirmed that he told Busch that he would arrest him if the police received a call that "you're smoking marijuana or running around naked." (Tr. at 2036.)

O'Leary, who remembered little, testified that Busch stated "he wouldn't allow himself to be arrested, [and] that he works for a higher authority." (Tr. at 939.) When confronted with his deposition testimony, DeRobertis conceded that he had heard the ambulance cancelled over the police radio. (Tr. at 355.) All of the officers denied the allegations of misconduct.

## II. Second 911 Call

Around 6:40 p.m., the police were once again called to Busch's apartment. Gravitch and Sanabria were the first officers to arrive. Gravitch was told that "[Busch] had been outside smacking the ground with a hammer" (Tr. at 1091) and "waving the hammer around scaring children in the neighborhood." (Tr. at 1092.) After speaking with neighbors, Sanabria testified that they walked over to the railing of Busch's apartment. (Tr. at 1188.) Once there, Busch walked out of his apartment holding a hammer in his hand. (Id.) Sanabria and Gravitch then tried to calmly coax Busch into putting the hammer down. (Id.) Sanabria testified that "[a]t some point [Busch] takes the ham-

mer and he bangs it against the side of the door frame and states: I'm not going to put the hammer down, you are going to have to shoot me if you want me to put the hammer down." (Id.) Sanabria recalled telling Busch that they didn't want to hurt him, but rather wanted to get him help. (Id.) Sanabria also recalled that Busch looked agitated, wouldn't listen, and kept walking in and out of his apartment. (Id.) As a result, Gravitch called for an emergency services unit ("ESU") and a sergeant. (Tr. at 1190, 1396.)

When Freeman, who was inside Busch's apartment, emerged from the apartment, Sanabria asked him to persuade Busch to put down the hammer. (Tr. at 1239.) Freeman responded that the hammer was a religious hammer and that "[Busch] wasn't going to put it down." (Tr. at 1193–94.) Sanabria then asked Freeman to come up the stairs, but Freeman refused, stating that he wished to remain with Busch. (Tr. at 1195–96.)[3]

Gravitch testified that Freeman told him to leave them alone, and stated that everything was okay, and that they were "praying or chanting." (Tr. at 1405.) Gravitch noticed chanting music coming from the apartment. (Id.) Gravitch recalled Freeman telling him that "everything was okay and that the hammer was inscribed by God to protect [he and Busch] from demons." (Tr. at 1406.) Gravitch observed Hebrew characters written on the hammer. (Id.)

Subsequently, Sgt. O'Brien arrived, and Sanabria updated him regarding the situation. Sgt. O'Brien then told Sanabria that he wanted to get "[Freeman] out of there." (Tr. at 1242.) Sgt. O'Brien testified that he did so in order to contain Busch and to save Freeman from Busch. (Tr. at 2079.) Sgt. O'Brien maintained that he was unaware that Freeman and Busch were friends. (Tr. at 2077.) After Freeman refused to come up the stairs, Sgt. O'Brien reached over the railing, grabbed Freeman's arm, rounded the railing, and pulled Freeman up the stairs. (Tr. at 2075). Officer Sanabria attempted to handcuff Freeman at the landing by the

3. Sanabria initially did not remember Freeman stating that he wished to remain with Busch, however, when confronted with statements made in his interview before the Civilian Complaint Review Board interview, he admitted testifying that Freeman made that statement. (Tr. at 1196.)

stairs.[4] By that time, Loshiavo, Sgt. Memoly, and O'Leary had arrived at the scene. (Tr. at 943, 1281, 1602.) Loshiavo and Sgt. Memoly both testified that they assisted in restraining Freeman. (Tr. at 1281–82, 1602.)

## A. Pepper spraying of Busch

As the officers were restraining Freeman, Gravitch, who was near the top of the railing, testified that Busch came out of his apartment, holding the hammer initially at his side. (Tr. at 1412.) Gravitch recalled that Busch then started waving the hammer above his head, and stated "let my friend go, release my friend, let him go." (Tr. at 1412.) After Busch refused to drop the hammer, Gravitch took out his pepper spray. (Tr. at 1415.) Gravitch testified that pepper spraying Busch was necessary because he "believed [that Busch] was going to come up the stairs and hit somebody with the hammer, most likely Sgt. O'Brien because he was standing there." (Tr. at 1416.) Gravitch further testified that he hoped the pepper spray would cause Busch to drop the hammer so that the officers could take him into custody. (Tr. at 1417.)

Gravitch pepper sprayed Busch. However, when this occurred is in dispute. Gravitch testified that he asked Sgt. O'Brien if he could pepper spray Busch immediately and did so after receiving approval. (Tr. at 1415.) Busch then "let out a loud scream, a loud yell and started charging up the stairs with the hammer raised." (Tr. at 1420.) Gravitch testified that Sgt. O'Brien, who was a few steps down from the top of the stairs facing Busch, turned around quickly and started heading up the stairs. (Tr. at 1421.) Eventually, Busch's hammer "made a connection with [Sgt.] O'Brien on the right side somewhere." (Tr. at 1421.) Gravitch then started over towards the top of the stairs, where he converged with Busch, who looked at him. (*Id.*) This caused Gravitch to back

up to avoid getting hit with the hammer, and he fell as a result. (Tr. at 1422.)

In contrast, Sgt O'Brien testified that Busch struck him with the hammer prior to being pepper sprayed. According to Sgt. O'Brien, Busch charged at him with the hammer, striking him in his back, arm, leg, boot, and gun. (Tr. at 2100–01.) Sgt. O'Brien described these hits as "baseball [like] swings." (Tr. at 2203.) Photos introduced into evidence revealed a small abrasion to Sgt. O'Brien's wrist. Sgt. O'Brien recalled that at one point, he was on the steps with his feet up, and that Busch was very close to being on top of him, so much so that O'Brien had to put his arm up to prevent himself from getting hit in the head. (Tr. at 2089.) It was at this time that Gravitch asked if he should mace Busch, and Sgt. O'Brien responded, "yes, mace him." (*Id.*) Sgt. O'Brien testified that the pepper spray "hit [Busch] in the nose, maybe the bridge of the nose," (Tr. at 2098) "went in his face," (*Id.*) and "ran down like water." (Tr. at 2100).

The remaining officers offer further details about the incident. Sgt. Memoly, who positioned himself a couple of steps from the top of the stairs and also authorized Gravitch to pepper spray Busch (Tr. at 1723), testified that Busch charged up the stairs and attacked Sgt. O'Brien with the hammer (Tr. at 1724). Sgt. Memoly testified that Busch hit Sgt. O'Brien with the hammer in his "midsection below his neck to his knee." (Tr. at 1724.) Specifically, Sgt. Memoly testified that Sgt. O'Brien was off balance[d] on his backside and Busch swung "back and forth across Sgt. O'Brien's body." (*Id.*) Sgt. Memoly, who then started scrambling up the stairs, "radioed and pleaded to have ESU respond forthwith." (*Id.*) O'Leary testified that Busch ran up the stairs towards Sgt. O'Brien, who had his back to him, and raised the hammer above his head, hitting Sgt. O'Brien in his gun belt or gun. (Tr. at 952.) Neither Sanabria nor Loschiavo saw whether

---

4. According to civilian witness Eisenberg, "Freeman started to walk out of the apartment and ascend the stairs, took a few steps up the stairs, one or two steps or something and was walking very casually, slowly then he hesitated and he seemed to pivot and try to descend again the stairs. And at that point, the officers lunged down and grabbed him by his clothes or his

arms, a few of them and hauled him up the stairs." (Tr. at 1840.) Eisenberg stated that "they jumped on [Freeman] and pinned him down to the floor and I presume they handcuffed him. They were all on top of him. It was quite a violent apprehension." (Tr. at 1841.) Eisenberg testified that his view was not obscured. (Tr. at 1842.)

Busch hit Sgt. O'Brien with the hammer. (Tr. at 1212, 1286.)

All of the civilian witnesses agree that Busch charged up the stairs with the hammer, however, most of them deny that Busch hit Sgt. O'Brien with the hammer. Templar testified that as Busch was running up the stairs, "he didn't push nobody, or didn't go after nobody, they just moved by the side and he came up the steps." (Tr. at 464.) Templar also testified that he saw Busch pepper sprayed as he started up the stairs. (Tr. at 445.) Eisenberg, who positioned Sgt. O'Brien in the middle of the stairway, testified that "there was no confrontation, just the officer trying to get out of the way as fast as he could, as well as the other officers [trying] to get out of his way so that he could get out of the stairs." (Tr. at 1843.) Eichenstein, however, testified that Busch came into close proximity with Sgt. O'Brien on the stairs. (Tr. at 598.)

### B. Shooting of Busch

The events leading up to the shooting once Busch arrived up the stairs are heatedly disputed. There is little consistency between the civilian witnesses' and Defendants' accounts of the shooting. Specifically, there is no unanimity regarding Busch's position once up the stairs; the distance between Busch and the officers; how Busch held and positioned the hammer; where the hammer fell; and how and where Busch fell. The only consistency is that all civilian witnesses, with the exception of Ionovitch, testified that Busch did not lunge or charge towards the officers prior to being shot. The officers and Ionovitch testified that Busch did lunge or charge at the officers prior to being shot.

Eisenberg, who watched the events from the double staircase to building 1619, testified that Busch traversed the driveway and positioned himself by the wall of the adjacent building, with the officers forming a semicircle around him. (Tr. at 1840, 1843–44.) Although there was at least one officer between him and Busch, Eisenberg testified that he could see the "entire top portion of Busch's body and perhaps part of his legs." (Tr. at 1896.) Busch stood erect with the hammer above his head as "he was scream-ing this screeching sound." (Tr. at 1847.) Eisenberg testified that the distance between Busch and the officers was "like out of arms' reach, you know, it was like four feet, five feet, maybe more." (Tr. at 1849.) Although Eisenberg initially testified at trial that Busch did not move, (Tr. at 1845–46), when defense counsel confronted him with his previous statement given to an FBI agent, Eisenberg conceded that before Busch was shot, he "saw him swaying subtly, but [again maintained that] there was virtually no movement." (Tr. at 1845–46, 1897.)

Eisenberg testified that he could "discern [that] there was one shot first and momentarily later at a very short interval there was a whole volley of shots that followed." (Tr. at 1846.) He also observed that Busch fell maybe a "a foot, two feet, two and a half feet, something like that" from the wall of the adjoining building stairway. (Tr. at 1849.) Specifically, Eisenberg testified that "[h]e wasn't right up against the wall but he was in the position where he had the wall to his back so that I don't think anyone could approach him." (*Id.*) When shot, Eisenberg recalled that "[Busch] just seemed to be like a pillow and these bullet holes just were puncturing his torso. He seemed to go pa-pa-pa-pa-pa-pa (ph.) You could hear like some sort of a concussion as the bullets penetrated him. I observed that they penetrated him and that after a few moments, blood started to ooze out from all these holes." (Tr. at 1846.) After the shooting, Eisenberg testified that he "noticed for the first time [that Busch] seemed to have some peace. His expression and his demeanor were—he looked like he had a tortured expression on his face and after he was shot, his face sort of became calm and he relaxed and his body just sort of slowly crumbled so it slowly went to the ground." (Tr. at 1847.)

Eichenstein, who was on the second floor balcony of 1617 46th Street, which is located next door to Busch's building towards 16th Avenue, testified that Busch positioned himself on the driveway of 1619 46th Street. (Tr. at 597.) Eichenstein testified that Busch, who was five or six feet away from the officers, held the hammer upward without moving. (Tr. at 598.) Eichenstein fur-

ther testified that Busch then began swaying a bit, specifically, "like [his feet were] on the same place but not balancing well." (Tr. at 602.) After he was shot, Eichenstein recalled that it took Busch a couple of seconds to fall, and when he did, "he fell down towards his right and landed on the floor almost on his back with his head reaching the wall of the staircase from the next house." (Tr. at 598.)

Kaufman, who watched the incident through the window of his house on the first floor at 1624 46th Street, testified that Busch positioned himself on the gutter facing the police officers, who were in a semi-circle alongside the house, about eight to ten feet away from Busch. (Tr. at 678.)[5] Kaufman testified that Busch was "very edgy and just moving within a radius of a circle of about two to three feet side by side, holding his hammer over his head." (Tr. at 680.) On cross-examination, Kaufman recalled that Busch was not moving the hammer forward, but rather Busch was "jumping and the hammer was jumping along with him." (Tr. at 711–12.) After being shot, Busch staggered "a little bit towards 1625 by the curb of the sidewalk." (Tr. at 715–16.) Kaufman testified that because Busch's back was to him he was unable to see Busch's face during the incident. (Tr. at 720.)

Rokeach was moving his mother's belongings at 1632 46th Street, the building diagonally across the street from 1625 46th Street, and at the time of the shooting was on his mother's balcony. Rokeach testified that once up the stairs, Busch darted across the driveway and then turned to face the officers, with his hands around the hammer raised above his head. (Tr. at 492–93.)[6] Rokeach testified that the officers then came around Busch in a semi-circle, some with their guns drawn, and were at least six to eight feet away from Busch. (Tr. at 493–94.) After Busch refused to drop the hammer, Rokeach heard one shot, followed by a volley of shots.

(Tr. at 494.) Rokeach testified that Busch fell where he had been standing. (*Id.*)

Olivo, who was assisting Rokeach with the move, and who was positioned behind the moving truck in front of 1632 46th Street, testified that Busch positioned himself at the edge of the sidewalk. (Tr. at 620, 624.) Olivo testified that the police officers stood in a half circle, ten to twelve feet away from Busch. (Tr. at 621, 661.) After Busch refused the officers' requests to drop the hammer, Olivo testified that he heard yelling, followed by two shots. (Tr. at 641, 642.) Olivo immediately ran inside, and once upstairs, he observed Busch's body "lying down by the building next to Busch's building." (Tr. at 621.) Later, Olivo noticed a flat tire in one of the moving truck's tires, two bullet dents located in the back of the truck, and that air was escaping from the bullet-pierced tire. (Tr. at 626, 627.) When cross-examined, Olivo conceded that he could not see whether Busch's legs moved. (Tr. at 664.)

Templar, who watched the incident from the right side of Busch's apartment, testified that Busch positioned himself "a little out of the driveway," about eight feet from the stairway, and four feet from the officers. (Tr. at 463, 470.) Templar testified that the officers were in a semi-circle on one side of Busch, and Busch was standing erect screaming with his hands clamped around the hammer at the top of his head. (Tr. at 470.) After he was shot, Busch walked two steps before falling down. Templar testified that he dropped the hammer after one step, and then fell by building 1625. (Tr. at 471–72.)

Tyberg, who stood in front of the gate that divides 1617 and 1619 46th Street, testified that Busch eventually positioned himself on the sidewalk facing the officers, who stood a couple of feet away. (Tr. at 396.)[7] Tyberg testified that Busch stood in one position with the hammer raised horizontally above his head. At that time, Tyberg said, "Busch was unbalanced like a drunk person" and his

---

5. Kaufman showed the exact location on one of the exhibits. (Tr. at 678–70).

6. When cross-examined, Rokeach admitted that he initially thought the hammer was a toy hammer. (Tr. at 536.)

7. Tyberg stood at the "range between [ ] Busch's apartment and the next building." (Tr. at 405).

"body swayed from [side to side with] his hands raised upward." (Tr. at 397.) Tyberg testified that he then heard shots and ran inside his house. (Tr. at 399.) Later, Tyberg observed that Busch's body "fell by the wall of 1625 at the edge of the house [before] the stairway." (Tr. at 399–00.)

Ionovitch, Defendants' critical civilian witness, testified that once Busch came up the stairs, he jumped over the cops and Freeman, screaming and holding the hammer with the claw facing forward. (Tr. at 2757–60.) Ionovitch testified that Busch positioned himself on the sidewalk in an upright position with the hammer raised, about five or six feet away from the officers. (Tr. at 2765.) After the cops drew their guns and began screaming at him, (Tr. at 2760), Busch lunged forward and swung the hammer sideways in a baseball-like fashion with the claw facing forward. (Tr. at 2761.) Ionovitch testified that the officers took steps backward and then attempted to remove the hammer away from Busch. (Tr. at 2762.) Ionovitch noted that the officers were unable to obtain the hammer because Busch was jumping from side to side. (Tr. at 2762.) Busch again lunged and swung the hammer at the officers, however, he eventually backed off. Finally, Busch swung the hammer at the officers for a third and final time. According to Ionovitch, "at this time, the officers were pretty much against the wall [with] nowhere to go, and they started to shoot and Busch kept coming forward until he fell backwards." (Tr. at 2762.) Ionovitch recalled that Busch looked like he took another step before he fully fell backwards. (Tr. at 2767.) Ionovitch estimates that two minutes elapsed from the time Busch maneuvered upstairs until he was shot. (Tr. at 2772.)

Gravitch, who did not shoot Busch, testified that Busch positioned himself on the driveway between Sgt. O'Brien and Sanabria. Gravitch recalled that Busch was initially standing still with the hammer by his side, and that "[a]fter [the officers] told him to drop the hammer [numerous] times, he raised the hammer and started to run forward towards the officers." (Tr. at 1104.)

Once shot, Busch "staggered a step or two to the right and back, and fell down [by the wall to next to the building.]" (Tr. at 1108–09.)

Loshiavo, who fired three shots and was to Sgt. O'Brien's left, testified that Busch waved the hammer back and forth over his head. Loshiavo then drew his weapon and told Busch to drop the hammer. (Tr. at 1283–84.) Loshiavo testified that Busch then lunged forward and took a step or two directly towards Sgt. O'Brien. (Tr. at 1284–85.) After being confronted with his grand jury minutes, Loshiavo recalled that "[a]t the time [Busch] was lunging forward, he was moving back and forth on his feet, with the hammer above his head coming forward." (Tr. at 1349.) Loshiavo, who was four or five feet away from Busch, then discharged his weapon. (Tr. at 1351.) Loshiavo testified that Busch took steps backwards and moved towards the wall, where he fell. (Tr. at 1290.)

Sgt. Memoly, who fired numerous shots, testified that Busch positioned himself at the end of the driveway. (Tr. at 1644.) According to Sgt. Memoly, Busch initially moved from side to side in an upright position with the hammer raised above his head. (Tr. at 1685.) Busch then lunged forward, and after taking a couple of steps, came down on Sgt. O'Brien's head with the hammer. (Tr. at 1688–89.) Sgt. Memoly testified that he shot Busch when Busch was within two to three feet of Sgt. O'Brien. (Tr. at 1692.) Once shot, Busch turned towards the street, took a step or two from the position where he was shot, dropped the hammer, took two or three more steps, and then fell. (Tr. at 1709–10.)

Sgt. O'Brien, who fired three shots, testified that Busch positioned himself in the driveway and charged towards him with the hammer. (Tr. at 2105–08, 2114.) When he discharged his weapon, Busch was two to four feet away. (Tr. at 2116.) Sgt. O'Brien testified that Busch continued at him as he discharged his weapon, and that he had to keep shooting to stop him. (Tr. at 2117.) After he was shot, Busch went to the right and across the driveway.[8] Sgt. O'Brien recalled that all of the shots appeared to be fired simultaneously.

---

8. During his interview before the Civilian Complaint Review Board ("CCRB"), Sgt. O'Brien stated that Busch stumbled and ran after he was shot. (Tr. at 2152–53.)

O'Leary, who was a rookie and did not shoot Busch, testified that Busch bumped into him at the landing by the stairs, causing him to stumble backwards and lose his footing. (Tr. at 952–53.) When he regained his footing, O'Leary located Busch in the driveway area at an angle about fifteen to sixteen feet from him. (Tr. at 953.) [9] O'Leary testified that Busch then screamed and charged at the officers with the hammer raised above his head. O'Leary recalled that Busch lunged forward three to four feet, and then shots were fired. (Tr. at 953.) O'Leary did not recall the aftermath of the shooting because he was in shock. (Tr. at 958, 1018.) On cross-examination, O'Leary testified that he did not discharge his weapon because there wasn't anytime to shoot once he regained his footing and that the distance was too great between [him and Busch.] (Tr. at 1011.)

Sanabria, who shot Busch three times, testified that Busch was initially eight feet away from him. (Tr. at 1220.) After Busch refused to drop the hammer, Busch lunged forward with the hammer above his head. At the time Sanabria discharged his weapon, Busch, who continued forward, was four feet away from him. (Tr. at 1219–20.) After the shooting ceased, Busch took another step towards Sanabria, turned around, and took a couple of steps back. (Tr. at 1221.)

### III. After the shooting

During trial, Plaintiff maintained that the hammer was moved by the police officers involved in the shooting from next to Busch's body (i.e. by the wall of 1625) to across the driveway. Both parties also presented testimony that the civilian witnesses and officers had colluded with one another in constructing their accounts of the shooting.

#### A. Moving Hammer

Plaintiff presented testimony of Goldstein, a paramedic with Hatzolah (Tr. at 731), and Sweeney, an off-duty police officer who also worked per diem as an EMS paramedic (Tr. at 550), in support of its theory that the hammer was moved across the driveway. Goldstein testified that he came to the scene when he heard the shots and saw the hammer across the driveway from Busch, who was against the wall at the other side of the driveway. (Tr. at 731–33.) Sweeney initially observed the hammer six inches from Busch's right hand. (Tr. at 556.) Sgt. Nyhan also testified that the hammer was close to Busch's body near the wall. (Tr. at 751.) Defendants called Accardo, who testified that without direction he guarded the hammer, which he contends did not move from the edge of the driveway. (Tr. at 2639.) [10]

#### B. Allegations of Collusion

Allegations of collusion by both parties permeated this trial. Plaintiff proffered testimony that the officers discussed the shooting at the scene of the shooting and afterward. Charach, a civilian witness, testified that while at Maimonides Hospital, he saw three officers enter together. He testified that one officer was "slugged over to the right slightly and he was like: Oh, what [did] I do? And he was going: Oh, what [did] I do, what [did] I do?" (Tr. at 588.) Charach testified that he saw another officer grab that officer, pull him into a room and shush him [in order to keep him quiet.]." (Tr. at 589.) Also, Eisenberg testified that Gravitch crossed out Eisenberg's name from his official police memo book after Eisenberg recounted his version of the incident. (Tr. at 1850–52.) Lastly, Esposito, a Fire Department paramedic who worked per diem as a hospital paramedic, testified that the officers were talking with one another in a group within a thirty foot circle after the shooting. (Tr. at 570–71.) Defendants established that many of the civilian witnesses talked about the shooting among themselves, with community leaders, and with members of Busch's family.

---

**9.** Initially, O'Leary testified that Busch was standing in the driveway area at an angle (Tr. at 953), however, on redirect, after being impeached with his Go–15 statement, he conceded that Busch was standing by the wall.

**10.** Plaintiff introduced the testimony of Captain Brian McMahon, Precinct Integrity Control Officer, who testified that he told Accardo to guard the hammer. (Tr. at 2358.)

## IV. Expert testimony

The parties offered expert testimony regarding the cause of death, proper NYPD police procedures, the effects of the pepper spray on Busch, and Busch's movements following the shooting. The Court will highlight some of this testimony. Dr. Charles Catanese, M.D. ("Dr. Catanese"), a New York City medical examiner, performed an autopsy of Busch and testified that the "cause of death [was] gunshot wounds to trunk and extremities with injuries of lungs, heart, liver and intestines." (Tr. at 265.) Specifically, Dr. Catanese determined during the autopsy that Busch suffered twelve separate gunshot wounds: four penetrating wounds to the trunk, two perforating wounds to the trunk, two perforating wounds to the left thigh, a perforating wound to the right thigh, two perforating wounds to the right arm, and a graze wound. (Tr. at 269–70.)

Dr. Catanese testified that there was no soot, stippling, or powder residue found within the wound track for any of the gunshot wounds. (Tr. at 278.) Dr. Catanese explained that the absence of soot, stippling, and powder residue means that the shots were distant, and not close. (Tr. at 280.) Dr. Catanese further explained that close range of fire is when the end of the barrel of the gun is held anywhere "up to approximately six to eight inches away from the body surface," and distant range is anywhere "greater than two feet." (Tr. at 298.) Dr. Catanese also detected acetone and isopropanol in Busch's vitreous humor. (Tr. at 294, 296–97.)

Dr. Lone Thanning, M.D. ("Dr. Thanning"), Plaintiff's medical examiner expert, opined that Busch was standing straight up when he was shot. Dr. Thanning found Busch's bullet wound to his femur to be significant, stating that if the wound occurs when a person is standing, the person would be no longer able to put weight on the bone. (Tr. at 1538.) Dr. Thanning explained that if the person tried to do so, "it would cause excruciating pain and cause them [momentarily after the shot,] to collapse to the ground." (Tr. at 1540.) Dr. Thanning point-

ed out that Busch's x-ray revealed that the left femur bone was "severely broken and shattered with the upper end of the bone pointing backwards, being pulled by the muscle to the back of his—toward the skin in his knee pad." (Tr. at 1539.) Dr. Thanning observed that "[t]he bones [were] squished together five inches." (Tr. at 1540.) On cross-examination, Dr. Thanning conceded that the compressed bone could have been the result of Busch taking steps back. (Tr. at 1567.)

The pepper spray's effectiveness was also at issue. The officers testified that the pepper spray had no effect on Busch, and Dr. Susi Vassallo ("Dr. Vassallo"), an emergency room physician called by Defendants as a pepper spray expert, opined that based on the evidence she reviewed, Busch was not incapacitated or affected by the pepper spray. (Tr. at 2431–32, 2450–51.) Dr. Woodhall Stopford ("Dr. Stopford"), Plaintiff's expert and professor and medical toxicologist at Duke University, opined that "Busch was likely blinded by being sprayed with pepper spray in the eyes and he would bump into people as he ran, that it's likely that he had panic or something else made him run from the scene." (Tr. at 880.)

Dr. Stopford testified that the presence of isopropanol in Busch's vitreous humor likely shows that Busch was pepper sprayed in the eyes. (Tr. at 874–5.) Dr. Vassallo testified that isopropanol was not an ingredient in the pepper spray used on Busch; and, thus, the pepper spray was not the source of isopropanol found in Busch's vitreous humor. (Tr. at 2456–57, 2459.) [11]

George Kristova, Defendants' ballistics expert, placed Busch five to eight feet from the officers, and testified that Busch was stepping forward in a blow and turning to his left at the time he was shot. (Tr. at 2841.) Edward Mamet, Plaintiff's police procedures expert, testified at length about police officers' training in dealing with emotional disturbed persons, specifically a sergeant's role in ensuring firearm control, deploying special equipment (e.g. a shield, nova stun gun, ta-

---

11. Plaintiff contends that Dr. Vassallo's testimony that the pepper spray can did not contain isopropanol should be discounted because she relied on hearsay.

ser, water cannon, and shepherd's hook), maintaining a zone of safety, and coordinating the efforts of the officers at the scene. (Tr. at 2241–45.) Grace Telesco ("Telesco"), Defendants' expert and former chairperson of the behavioral sciences department at the New York City Police Academy, also testified regarding the techniques police officers should utilize when dealing with EDPs. Telesco testified that a police officer may not take into custody a person who exhibits signs of mental illness but is not a danger to himself or others. (Tr. at 2291–92.)

During trial, Defendants argued that the radio run tape and the sequence of events as recorded on the Sprint and FDNY reports demonstrated that the entire shooting took place between 6.5 and 8 seconds after Busch ran up the stairs. Plaintiff argued during closing that those reports are unreliable and are contradicted by Defendants' testimony and memo books.[12]

### DISCUSSION

Plaintiff filed motions for judgment as a matter of law, a new trial, and post jury hearing and interviews.

### I. Motion for Judgment as a Matter of Law

■■■ Plaintiff moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) against Sgt. O'Brien, Sgt. Memoly, and Gravitch on the substantive due process and excessive force claims. In its Rule 50(a) motion, Plaintiff only challenged whether Defendants were entitled to

qualified immunity. Where a party has failed to raise arguments in a pre-verdict motion made pursuant to Fed.R.Civ.P. 50(a), those arguments cannot be raised in a Rule 50(b) motion. See McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir.1997) ("a post-trial motion for JMOL can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury.").[13] Because Plaintiff failed to raise this argument in its pre-verdict motion, this Court finds that Plaintiff waived its right to judgment as a matter of law.[14]

### II. Motion for a New Trial

■■■ Plaintiff also moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a) against Sanabria and Loschiavo, or in the alternative, a new trial against all Defendant officers. "A district court should grant a new trial motion if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" See United States v. Landau, 155 F.3d 93, 104 (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988)). A court has the power to grant a new trial even if substantial evidence supports the jury's verdict. Landau, 155 F.3d at 104. The trial court is free to weigh the evidence, including witness credibility, for itself, and need not view it in the light most favorable to the non-moving party. Id. (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir.1998)). "[W]here the resolution of the issues de-

---

**12.** Plaintiff contends that the testimony and evidence shows that the relative time that elapsed is actually "more than one minute." (Aff. of Myron Beldock at ¶ 82.)

**13.** Rule 50(a)(2) of the Federal Rules of Civil Procedure provides that the moving party must bring its motion at any time before submission of the case to the jury. Rule 50(b) of the Federal Rules of Civil Procedure provides that if a court rejects a motion for judgment as a matter of law made at the close of evidence, the moving party may renew its motion no later than ten days after judgment has been entered.

**14.** The Court recognizes that an exception exists if necessary to prevent "manifest injustice," but finds that the exception is inapplicable here. Even if the Court were to consider this exception,

the motion would be denied based on evidence that exists in support of the verdict. Stephenson v. Doe, 332 F.3d 68, 75–76 (2d Cir.2003) (quoting Pahuta v. Massey–Ferguson, Inc., 170 F.3d 125, 129 (2d Cir.1999)). The Second Circuit is clear that "a district court may grant a motion for judgment as a matter of law 'only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that a reasonable and fair minded men could not arrive at a verdict against [the moving party.]'" United States v. Landau, 155 F.3d 93, 100 (2d Cir.1998) (quoting LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995)).

pend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Id.* at 104–05. "However, these principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice." *Id.*

### A. Substantive due process claim

■ Plaintiff claims that Sgt. O'Brien violated Busch's Fourteenth Amendment right to substantive due process by failing to take him to the hospital during the first police call. Plaintiff contends that abundant testimony demonstrated Busch's need for medical assistance, and Sgt. O'Brien, for no good reason, deprived Busch of that necessary medical care.

■ The Supreme Court has "emphasized time and time again that the touchstone of due process is the protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental interest." *County of Sacramento v. Lewis,* 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The substantive due process guarantee of the Fourteenth Amendment protects individuals from "conscience-shocking" exercises of power by government actors. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir.2001) "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* (*quoting County of Sacramento,* 523 U.S. at 849, 118 S.Ct. 1708).

Although the Court does not discount Spira's, Landau's, and Horowitz's testimony that Busch exhibited signs of EDP behavior and requested medical care, the Court is unpersuaded that Sgt. O'Brien's actions rose to the "conscience-shocking" level. The evidence connecting Sgt. O'Brien to Busch during the first police incident is sparse. Sgt. Nyhan was clearly in charge and primarily interacted with Busch. Sgt. O'Brien testified that he was near Busch for no more than four minutes. (Tr. at 2191.) Even if Sgt. O'Brien

interacted with Busch longer, Plaintiff has failed to show that O'Brien's actions left Busch in a worse position than he would have been had Sgt. O'Brien not arrived. The Court is not convinced that the jury reached a seriously erroneous verdict on this claim or that the verdict was a miscarriage of justice.

### B. Excessive Force Claims

■ Plaintiff avers that Defendants violated Busch's Fourth Amendment right against excessive force by pepper spraying and shooting him. "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (*quoting Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Under the Fourth Amendment, law enforcement officers may use only such force as is objectively reasonable under the circumstances. *See O'Bert ex. rel. Estate of O'Bert v. Vargo,* 331 F.3d 29, 36 (2d Cir. 2003). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (*quoting Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865). "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless that officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (*quoting Tennessee v. Garner,* 471 U.S. 1, 3, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The court will analyze Plaintiff's motion for a new trial on the pepper spray and shooting claims separately.

### i. Pepper Spray

■ The evidence at trial established that Gravitch was justified in pepper spraying Busch in the stairway. The Court credits Gravitch's testimony regarding his decision to pepper spray Busch:

All the factors leading up to that point, I was told by people in the street he was hitting the hammer into the sidewalk, he was scaring people with it, children with it in the street. He hit it in the door frame. When I talked to him in the beginning, he told me I would have to shoot him to get him to drop it and he told me that he is not going to drop it. All these factors led me to believe that he is dangerous with that hammer in his hand ... I believe[d] he would go up the stairs and hit Sergeant O'Brien who was standing on the stairs, hit him with the hammer.

(Tr. at 1145–46.)

The Court is not convinced that the jury reached a seriously erroneous verdict on this claim or that the verdict was a miscarriage of justice.

### ii. Shooting

 The jury found by a preponderance of the evidence that in shooting Gary Busch, Defendant officers did not deprive Busch of his constitutional right to be free from the use of excessive force. (Tr. at 3329.) [15] In evaluating Plaintiff's motion for a new trial, the Court will focus on the officers'·and civilian witnesses' testimony regarding Busch's movements prior to being shot. Defendants contend that the officers were justified in shooting Busch regardless of whether he was moving towards them because he posed a threat of serious bodily injury or death. The Court rejects this view. Fourth Amendment law is clear that where the person or suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him or take him into custody does not justify the use of deadly force to do so. *See Vargo*, 331 F.3d at 36. Whether deadly force was justified turns on whether Busch was lunging or charging at the officers with the hammer raised. This determination will turn on the credibility of the witnesses' testimony.

Defendants aver that the officers', Ionovitch's, and Kristova's testimony establish that Busch was lunging or charging towards Sgt. O'Brien with a raised hammer when he was shot. Defendants maintain that the civilian witnesses' testimony to the contrary must be discounted because many of them were far away and their views were obstructed. Moreover, Defendants point out that the civilian witnesses admitted that they had discussed the shooting among themselves and had been contacted by Busch's family and/or his lawyers.

**15.** With respect to the excessive force shooting claim, the jury was instructed in part as follows: You first must determine whether the defendants committed the alleged act. To determine whether the act caused Gary Busch to suffer the loss of a federal right, you must determine whether the force used to take Gary Busch into custody was that which a reasonable officer would have employed in effectuating that goal under similar circumstances. In making this determination, you may take into account the following factors: severity of the crime at issue, if any; whether Gary Busch posed an immediate threat to the safety of the defendants or others; and whether Gary Busch actively resisted being taken into custody or attempted to evade being taken into custody by flight. You do not have to determine whether the defendants had less intrusive alternatives available, for the defendants need only to have acted within that range of conduct identified as reasonable.

Where the person or suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him or take him into custody does not justify the use of deadly force to do so. However, where the officer has probable cause to believe that the person or suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force, provided that, where feasible, some warning has been given. In that respect you may consider all of Gary Busch's actions from the first moment he observed the police and all other relevant facts known by the officers on the scene before Gary Busch was shot, in determining whether it would have been "objectively reasonable" for a reasonable police officer to have acted as the defendants did under the actual circumstances you find them to be.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Not every push, shove or striking, even if it is forceful, and even if it may later seem to be greater than necessary while you sit here in court, is a constitutional violation. You must allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation. (Tr. at 3280–82.)

Plaintiff counters that the weight of the *credible* testimony, physical evidence, and circumstantial evidence warrants a new trial. Plaintiff maintains that the officers' versions of the incident are not credible and are unsupported by the physical evidence. Moreover, Plaintiff vehemently contends that Ionovitch's testimony was "rife with inconsistencies and [ ] contrary to the testimony of all eyewitnesses." (Pl.'s Reply Brief at 4).

After considering the parties' arguments and thoroughly reviewing the evidence, the Court finds that a new trial is warranted because the jury's verdict on the excessive force shooting claim is against the weight of the evidence presented at trial, and permitting the verdict to stand would result in a miscarriage of justice. Although Defendants presented testimony that Busch lunged or charged towards the officers prior to being shot, abundant testimonial evidence exists that lends serious doubt to the credibility of some of the police officers' and Ionovitch's testimony. *See, e.g., Ruffin v. Van Fuller,* 125 F.Supp.2d 105, 110–111 (S.D.N.Y.2000) (finding the jury's verdict seriously erroneous where court was convinced that "no reasonable jury having examined the testimony and evidence could have concluded that plaintiff's constitutional rights were not violated").[16]

The officers, particularly Sgt. Memoly and Sgt. O'Brien, gave exaggerated or overstated versions of the events, especially regarding key details about the shooting. With respect to the distance between Busch and the officers prior to the shooting, most of the witnesses testified that the distance ranged from four to twelve feet. Sgt. O'Brien, however, claimed that Busch was very close to him when he fired, and Sgt. Memoly claimed that Busch was coming down on Sgt. O'Brien's head during the shooting. As pointed out by Plaintiff, these overstatements undermine the officers' credibility, and are in direct conflict with even Defendants' own ballistics expert, who testified that Busch was five to eight feet away from the officers. Moreover, Dr. Catanese testified that the

absence of soot, stippling, or powder residue confirms that Busch was not shot at close range. (Tr. at 280.)

Likewise, the court also discredits the testimony of many officers who testified that Busch crossed the driveway after he was shot. As pointed out by Plaintiff, the civilians' testimony that Busch fell soon after being shot was much more credible in light of Dr. Thanning's testimony that Busch would have fallen almost immediately after his femur was shattered. Moreover, Plaintiff presented credible testimony suggesting that the hammer was moved after the shooting to a location across the driveway from where Busch fell. As stated *infra*, Sgt. Nyhan testified that the hammer was close to Busch's body near the wall. (Tr. at 751). Officer Sweeney testified that the hammer was located six inches from Busch's right hand. (Tr. at 556.) In contrast, Goldstein, who arrived later, testified that the hammer was across the driveway opposite from the body. (Tr. at 731–33.) Although Officer Accardo testified that he guarded the hammer in the driveway, he did not do so immediately following the shooting.

Moreover, the Court has serious questions as to the truthfulness of other portions of the testimony of the officers as well. Sgt. O'Brien's untruthful statements concerning a violent encounter with Busch on the stairs were not supported by the evidence. Sgt. O'Brien demonstrated powerful and violent "baseball" swings by Busch, wielding a hammer, that struck his body. However, pictures taken shortly after the incident disclosed only a slight abrasion on Sgt. O'Brien's wrist. Moreover, Sgt. O'Brien's testimony that Gravitch pepper sprayed Busch after he was hit with the hammer is inconsistent with Gravitch's and other witnesses' testimony. Also, while there were six officers who contained Busch in a semi-circle, two chose not to shoot Busch. The Court finds it implausible that these officers would chose not to shoot at Busch given their testimony that Busch lunged or charged forward with the hammer raised towards the officers.

---

**16.** Although *Ruffin* is not on all fours with this case, the Court finds its reasoning persuasive, and, like the Court in *Ruffin,* finds that a new trial is warranted.

Lastly, Ionovitch's account of the shooting strains credulity. Ionovitch's testimony conflicted with all other eyewitnesses, including, the officers'. Ionovitch was the only witness to testify that Busch moved in stages at the officers, that Busch took baseball-like swings at the officers with the hammer claw facing them, that the officers attempted to grab the hammer from him, and that the officers were nearly backed up against the wall when they shot Busch. Ionovitch's testimony regarding Busch jumping over Freeman and the officers and Freeman being taken to the police car prior to Busch getting shot is also inconsistent with all other testimony. (Tr. at 2758–60.)

■ The court is aware that "the more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806, at 67 (2d ed.1995). The district court, however, is in a unique position to assess the credibility of the witnesses and to determine the weight which should be accorded to their testimony. *See Song*, 957 F.2d at 1047. Although there were inconsistencies in the testimony of Plaintiff's civilian witnesses, after thoroughly examining the record, the Court finds more credible their collective testimony that Busch did not lunge or charge at the officers prior to being shot.

The Court discounts Defendants' argument that the civilian witnesses colluded with one another and that the civilian witnesses' testimony should be rejected because of the purportedly obstructed views and lengthy distance from the shooting. The Court notes that not all of the witnesses' views were impaired, and that none of the witnesses testified that contact with the Busch family or lawyers caused them to alter their testimony. On the other hand, Plaintiff presented specific testimony suggesting collusion by the officers. Eisenberg testified that Gravitch crossed Eisenberg's name out of his official police memo book when he recounted his version of the incident immediately after the shooting. (Tr. 1850–52.) Eisenberg's testimony is corroborated by Gravitch's memo book, which shows that Eisenberg's name was crossed out. Charach testified that he saw an officer attempt to silence a distraught officer who was questioning his actions during the shooting. (Tr. at 588–89.) Lastly, Esposito testified that the officers were talking with one another in a group within a thirty foot circle following the shooting. (Tr. at 570–71.)

■ Although a court should rarely disturb a jury's evaluation of a witness's credibility, "principles of deference [to jury findings and verdicts] do not override the trial judge's duty to see that there is no miscarriage of justice." *Landau*, 155 F.3d at 105.[17] In this case, the Court is convinced that there was a miscarriage of justice, and thus, grants Plaintiff's motion for a new trial against all Defendants on the excessive force shooting claim.

### III. Motion for Post-trial Interview of Jurors and Hearing

■ Plaintiff moves for juror interviews, an investigation, and a post-trial juror hearing based on information received from an anonymous source claiming that juror number ten wore a New York Police Department cap to court. Plaintiff avers that given the heavy weight of the evidence in Plaintiff's favor and the brevity of the jury's delibera-

---

**17.** Wright & Miller noted the difficulty in deciding a motion for a new trial:

On the one hand, the trial judge does not sit to approve miscarriages of justice. The judge's power to set aside the verdict is supported by clear precedent at common law, and far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in light of the facts of the particular case. If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806, at 74 (2d ed.1995).

tion, the report is sufficient to conclude that the jury's decision was due, at least in part, to an extraneous influence. Plaintiff further avers that the failure of other jurors to report the cap incident questions the neutrality of the entire jury.

Defendant counters that the allegation from an anonymous source does not support a post-trial hearing. Even, assuming arguendo that juror number ten did wear a cap with an NYPD logo, Defendants argue that Plaintiff failed to show that juror number ten was biased or that he unduly affected the jury deliberations. Defendants maintain that Plaintiff waived any claim of juror misconduct because Plaintiff knew about the purported NYPD cap prior to jury deliberations and failed to notify the court.

 In deciding whether to hold a post-trial hearing to investigate juror bias, misconduct or extraneous influence, courts have repeatedly found it necessary to balance the defendant's right to a fair and impartial trial against the interest of preserving the sanctity of jury verdicts and the protection of jurors from harassment and intimidation. *See United States v. Moten,* 582 F.2d 654, 664 (2d Cir.1978); *United States v. Matthew Ianniello, et al.,* 740 F.Supp. 171, 194 (S.D.N.Y.1990). In weighing these interests, courts consider the burden of trials and harmless error rules.[18] *See McDonough Power Equip., Inc. v. Greenwood, et al,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

In *United States v. Sun Myung Moon and Takeru Kamiyama,* the Second Circuit explained that:

> a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred which could

have prejudiced the trial of a defendant. A hearing is not held to afford a convicted defendant the opportunity to "conduct a fishing expedition."

718 F.2d 1210, 1234 (2d Cir.1983) (*quoting U.S. v. Moten,* 582 F.2d 654, 666–67 (2d Cir.1978)).

In *Moon,* the defendant moved for a post-trial hearing after being notified that juror tapes existed indicating exposure to outside influences or extraneous prejudicial information, namely, newspapers containing articles relating to the case. The trial court declined to examine additional jurors or to conduct a thorough investigation. In *The Chase Manhattan Bank, N.A. v. T & N,* the court denied a motion for a post-jury hearing, explaining that "mere allegations of impropriety are insufficient to compel the granting of a new trial or even the conducting of a post-trial jury hearing." No. 87–4436, 1997 WL 221203, at *6, 1997 U.S. Dist. LEXIS 5722, at *17 (S.D.N.Y. Apr. 28, 1997). Even where exposure to extraneous influences had occurred, "the court must still 'apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.'" *Id.* (*quoting Bibbins v. Dalsheim,* 21 F.3d 13, 17 (2d Cir.1994)).

Plaintiff has not provided evidence that juror ten actually wore an NYPD cap, nor has Plaintiff demonstrated that such an incident constitutes clear, strong, substantial and incontrovertible evidence of bias or extraneous influence. *See United States v. Simon Abcasis, Ralph Abcasis and Rebecca Abcasis,* 811 F.Supp. 828, 836 (E.D.N.Y.1992) ("[t]he conclusory statements submitted by [plaintiff's] counsel in support of this motion, all of which are based on hearsay allegations, can hardly meet such a stringent requirement ... [A] trial court may properly deny a [plaintiff's] claims of juror misconduct on the sole ground that the only proffer in support

---

**18.** Federal Rule of Civil Procedure 61 provides, "No error...is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error in the proceeding which does not affect the substantial rights of the parties." 28 U.S.C. § 2111 provides, "on the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

thereof is the hearsay allegations contained in the affidavit of [plaintiff's] counsel.").

If post-trial inquiries into jury deliberations were routinely permitted, these private discussions "would become the constant subject of public investigations," thus destroying jurors' ability to freely satisfy their civic duty, *see Ianniello,* 740 F.Supp. at 194 (*quoting McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)), and decreasing the public confidence in judicial finality. *See Moten,* 582 F.2d at 665. "Courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *Moon,* 718 F.2d at 1234. Thus, Plaintiff's motion for a post-trial hearing is denied.

## CONCLUSION

For the reasons described herein, Plaintiff's motion for a new trial against all Defendants on the excessive force shooting claim is GRANTED. Plaintiff's other motions are DENIED.

SO ORDERED.