Leroy J. **RASANEN,** as Administrator of the Estate of John C. Rasanen, deceased, Plaintiff,

v.

Daniel **BROWN,** Defendant.

No. 04–CV–1995(ADS)(GRB).

United States District Court, E.D. New York.

Jan. 23, 2012.

Harry H. Kutner, Jr., Esq., Mineola, NY, for Plaintiff.

Eric T. Schneiderman, New York Attorney General, by: Ralph Pernick, Assistant Attorney General, Dorothy Oehler Nese, Assistant Attorney General, Mineola, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

ARTHUR D. SPATT, District Judge.

On May 6, 2011, after eleven days of trial and approximately seven days of deliberation, a jury rendered a verdict finding defendant Trooper Daniel Brown not liable for using excessive force in the shooting death of John C. Rasanen. Presently before the Court is a motion by the plaintiff Leroy J. Rasanen, the administrator of Rasanen's estate, for a new trial pursuant to Federal Rule of Civil Procedure 59(a). In addition, the Plaintiff

moves for permission to obtain juror affidavits or conduct post-trial juror interviews to determine whether the jury applied the correct legal standard. For the reasons set forth below, both motions are denied.

## I. BACKGROUND

### A. *Factual Background*

This case arises from the shooting death of John C. Rasanen ("Rasanen") by Trooper Daniel Brown ("Brown") during the execution of a search warrant at Rasanen's residence at 12 Overlook Drive in Aquebogue, New York ("the residence") on May 17, 2002. The following constitutes the undisputed facts leading up to the shooting.

In December of 2000, the New York State Police Narcotics Enforcement Unit ("NEU") received information from a confidential informant that the decedent, Rasanen, was selling drugs out of multiple locations on the East End of Long Island. In concert with the Suffolk County Police Department, the NEU used surveillance, wiretaps, and undercover operations to gather information about Rasanen and his alleged drug activities. Pursuant to this investigation, a search warrant was issued for Rasanen's residence at 12 Overlook Drive in Aquebogue, New York to be executed on May 17, 2002, between the hours of 6:00 a.m. and 9:00 p.m.

The warrant was executed by the New York State Police's Mobile Response Team ("MRT"). The MRT was comprised of Daniel Brown, his partner Michael Etherton, as well as David Verne, Scott Dibble, Paul Antonovich, Robert Buell, Timothy Pidgeon, and Christopher West. Prior to executing the warrant, the MRT received two operational briefings. The first briefing was on the evening of May 16, 2002 and the second briefing was on the morning of May 17, 2002, at approximately 5:00 a.m. Without regard to its propriety, there is no dispute that MRT were informed during these briefings that Rasanen was armed, dangerous, and had made threats against police officers.

The MRT arrived at Rasanen's residence on the morning of May 17, 2002. Upon arrival, Dibble and Vern entered the upper level of the residence first, followed by Antonovich and Pidgeon, and then Buell and West. Brown and Etherton were the final officers to enter the residence, and proceeded down the stairs to the lower level, where intelligence previously gathered by the investigating agencies suggested that Rasanen's bedroom was located.

During the course of executing the search warrant, Trooper Brown shot and killed Rasanen. The only other eyewitness to the shooting was Angela Chinnici ("Chinnici"), who watched the encounter unfold from her vantage point in Rasanen's bed. The Court will explain the disputed facts with respect to the shooting in its discussion of the trial.

### B. *Procedural History*

The plaintiff, Leroy Rasanen, Rasanen's father and the administrator of his estate ("the Plaintiff") commenced this action on May 14, 2004 and filed an amended complaint on September 2, 2004 naming as defendants: (1) MRT members Daniel Brown, Michael Etherton, David H. Verne, Scott G. Dibble, Paul C. Antonovich, Robert A. Buell, and Timothy C. Pidgeon and (2) James W. Dewar, John W. O'Brien, Keith M. Skala, Tyler R. Finn, Tammy M. Mickologer, Rodney C. Polite, Alan T. Brock, Bartosz J. Chilicki, and Michael A. Pellegrino, who were alleged to either have some involvement in the underlying investigation; planning the execution of the search warrant; attending to Rasanen fol-

lowing the shooting; or the subsequent investigation of the shooting. In the amended complaint, the Plaintiff asserted against all defendants a cause of action pursuant to 42 U.S.C. § 1983 ("section 1983") on the ground that the shooting constituted excessive force in violation of the Fourth Amendment and a second cause of action alleging that the defendants acted negligently in planning and/or participating in the search of the residence, and in providing medical assistance to Rasanen after he was shot.

On March 25, 2009, the Court issued an order granting in part and denying in part the defendants' motion for summary judgment. *See Rasanen v. Brown,* 603 F.Supp.2d 550 (E.D.N.Y.2009). First, the Court dismissed the section 1983 excessive force claim against all defendants with the exception of Etherton and Brown because they "were not in Brown's presence when he shot Rasanen and therefore could not possibly have had a reasonable opportunity to intervene". *Id.* at 554. In denying the defendants motion to dismiss the excessive force claim as against Etherton and Brown, the Court noted that a discrepancy in the expert testimony regarding the distance from which Rasanen was shot, and "the differing accounts offered by Brown and Chinnici—the only two surviving eyewitnesses", which impacted the credibility of Brown's account and therefore presented issues of fact as to whether Brown's conduct was objectively unreasonable. *Id.* at 555–56. In addition, the Court denied the defendants motion to dismiss the negligence claim because the defendants failed to address the merits of the cause of action in their summary judgment submission. *Id.* at 556.

## C. The Trial

On April 4, 2011, a jury was selected and trial in this matter began on April 5, 2011.

At the commencement of the trial, the case continued to proceed against all of the defendants on the negligence claim, and against Brown and Etherton on the excessive force claim. However, at the conclusion of the Plaintiff's case, the Plaintiff voluntarily dismissed the excessive force claim against Etherton. In addition, the Court granted a motion by all of the defendants for judgment as a matter of law on the negligence claims. Thus, the only cause of action remaining in the case and submitted to the jury, and the only cause of action challenged in the instant motion, was the section 1983 claim against Brown for use of excessive force in shooting Rasanen.

As a result, a substantial amount of testimony from the trial involved claims and defendants that are not the subject of the instant motion. The Court summarizes below only the facts and testimony relevant to the section 1983 excessive force claim against Brown.

### 1. The Shooting

At the trial, the two eyewitnesses, Brown and Chinnici, testified as to their recollection of the shooting. Although both witnesses were cross-examined extensively on their previous statements about the incident, the following accounts are limited to their version of events as presented to the jury at the trial. In addition, the Plaintiff presented his own theory of what actually occurred during the confrontation between Brown and Rasanen, which is also summarized below.

#### a. Brown's Trial Testimony

Brown testified at three different times during the trial. His testimony was as follows. After entering the residence, Brown proceeded downstairs to the basement, followed by his partner, Etherton. After walking through a dimly lit hallway, Brown forced open the door to Rasanen's

bedroom, and yelled "State Police" "get down". When Brown entered the room, the room was dark, Rasanen was standing approximately four feet away from him, and moving. (Tr. 1378, 1393, 1426.) Brown testified that Rasanen's hands were at his side and out of Brown's view. (Tr. 1378.) Brown took one or two steps inside the room, at which point Rasanen charged at him and came into contact with the flashlight in Brown's left hand, which Brown used to hold him off. (Tr. 1396, 1415.) Brown then felt his own gun, a Glock 17, which was in his right hand, being turned towards him. However, Brown testified that did not know whether Rasanen was using his hands or some other part of his body to turn the gun. (Tr. 1436.) Brown then dropped the flashlight, got control of his gun and fired the shot, causing Rasanen to fall backwards. (Tr. 1424–25, 1506.) According to Brown, when he fired the shot, he was still standing in the room, right near the door. (Tr. 1428.) After firing the shot, Brown also fell backwards outside of the room, falling into Etherton, and then hitting the wall of the living room. (Tr. 1464–65.) Brown testified that he shot Rasanen out of fear for his own life because: (1) it was a dark room and he could not see; (2) Rasanen charged at him "very hard" and (3) his weapon was "being forced back into [him]" and he "didn't feel [he] needed to be shot with [his] own gun". (Tr. 1393.)

Brown then went back into the room, picked up his flashlight, scanned the room, and saw Rasanen laying on his side with his head towards the door. (Tr. 1495–96.) He then went over to Chinnici who was laying on the bed and pulled the covers off her. (Tr. 1502.) Brown's recollection of subsequent events is not clear, although he recalls Etherton taking him upstairs and West taking his gun. (Tr. 1257.) Although written evidence indicates that he made statements to various officers about the shooting, he does not recall making them. (Tr. 1256–57, 1262.) Nor does Brown recall being told not to talk to anyone about the incident. (Tr. 262.)

Following the shooting, Brown was removed from the scene and was taken first to Riverhead Hospital, and then to Gabreski, the Westhampton Air Force Base. (Tr. 75–76.) Brown then wrote a statement recounting his version of the incident. Brown subsequently recounted the events of May 17, 2002 before the grand jury, at a department interrogation session, at his deposition in the instant case, and in an affidavit in support of his motion for summary judgment in the instant case. All of these versions were introduced during trial and Brown was cross-examined on alleged inconsistencies between his various statements and his trial testimony.

### b. Chinnici's Trial Testimony

Angela Chinnici was a friend of Rasanen's, who was sleeping at the residence on the day of the shooting. Chinnici testified that she was asleep next to Rasanen in his bed when she was awakened by the loud bang of the MRT entering and the footsteps upstairs. (Tr. 1305–07.) Chinnici heard voices yelling "police, get down". (Tr. 1307.) After she heard the loud bang of the MRT entering and the footsteps upstairs, she woke up Rasanen and asked what was going on. (*Id.*) When he woke up, Rasanen jumped over her, said "oh shit", and was standing beyond the foot of the bed, between the bed and the television area. (Tr. 1307–08, 1343.) After Rasanen jumped out of the bed, he closed the door to the bedroom and was "standing in the middle of the room, walking back and forth ... from one side of the room to the other". (Tr. 1309–10.) At this point, Chinnici heard the MRT coming down the stairs yelling "police". (Tr. 1310.) She then observed Rasanen drop something

behind the television stand, and go back to the middle of the room. (Tr. 1310–11.)

When Brown came in, she was sitting up in the bed, and Rasanen was standing in the middle of the room, between the doorway and the bed. (Tr. 1311.) Chinnici then heard a loud pop, followed by a lot of smoke. After the shot was fired, Rasanen fell to the ground, and "was laying face down with his head out to the side", with "[h]is head at the end of the bed, and his feet towards the night table". (Tr. 1318–19.) Chinnici testified that she did not see Rasanen struggle with Brown for the gun or lunge at Brown, (Tr. 1326), and that it was "seconds" between when Brown entered the room and Rasanen was shot, (Tr. 1342).

A trooper then came over to her and told her she had to leave the room. (Tr. 1316.) After she was taken outside, Chinnici gave a statement to the police in the back of the police car, which an officer transcribed by hand and then typed. She signed both the handwritten and typed statements. She was then taken to the police station in Riverheard where she gave a second statement, which was typed and signed. Chinnici recounted the events of May 17, 2002 again in front of the grand jury, and at her deposition in the instant case. All of these versions were introduced during trial and Chinnici was cross-examined on alleged inconsistencies between her various statements and her trial testimony.

### c. The Plaintiff's Theory

In his closing statement, the Plaintiff's counsel presented the following scenario to the jury that was not based on the testimony of Brown or Chinnici, but rather on the physical evidence and expert testimony:

> How did it really happen? ... John Rasanen was getting out of bed. Trooper Brown's clock had been ticking because he hadn't found the cellar stairs.

Trooper Brown got down there, and he realized that a substantial amount of time had passed. Trooper Brown had been told this pablum that John Rasanen "Dillinger," was lurking in the shadows for him. He kicks the door open for him. Kicks the door open, and he heard the sound of glass breaking.

As Trooper Brown went into the room and scanned to the left—he said he didn't know the bed was to the right. Piecing it together, the only plausible story here, Trooper Brown kicked in the door, scanned to the left, glass broke....

Whatever it was, whatever happened in Trooper Brown's mind at that point, he stands left, he hears movement. Perhaps he hears the glass. Hears movement, turns to his right. John Rasanen is jumping out of bed.

Forget Chinnici's version. Forget Trooper Brown's version. He was next to the bed when he was shot. His feet ... his feet were down by the nightstand. There's another picture showing his foot, while he's lying on the ground, almost touching the nightstand.

So we know that's where his feet were when he was shot. His feet pitched forward. He stands, hears glass breaking, hears movement, turns. That's when he fired.

(Tr. 2423–25.) According to the Plaintiff, Brown's story of a struggle was concocted after the fact, and belied by evidence of the gunshot range, bullet trajectory, the location of Rasanen's body after he was shot, and physical evidence at the crime scene.

### 2. Expert Testimony

#### a. Medical Experts

The Plaintiff called as a medical expert Dr. James C. Wilson, a forensic patholo-

gist who works for the Medical Examiner Division of the Health Department in Suffolk County and who performed the autopsy on Rasanen. On May 17, 2002, Dr. Wilson was called to the residence to investigate the scene and arrived at approximately 9:00 a.m. (Tr. 101.) Upon arrival, Dr. Wilson testified he was given some information, but not a great deal of information about what had occurred. (Tr. 100–01.) When he entered the room, Dr. Wilson observed that Rasanen's body was face up, there was a large amount of blood on the rug beside him, a hole in the wall above the head of the bed, some red spots on the wall, and some red spots on a piece of furniture next to the bed. (Tr. 102–04.) Dr. Wilson was told that Rasanen was face down when the medical emergency personnel got to the scene and he was turned over to be evaluated for signs of life. (Tr. 104.)

With respect to the gunshot, Dr. Wilson testified that the entry wound was located in the upper left side of Rasanen's chest and was 56 inches above the heels and the exit wound was on the upper left side of his back 54 inches above the heels. (Tr. 124–25, 130.) The size of the entry wound was approximately 4/10ths of an inch; between a quarter of an inch and half an inch and the exit wound was .5 inches. (Tr. 129–132.) According to Dr. Wilson, the bullet hit bone between entry and exit, in particular, there were fractures in the third rib on the front side of the chest and the sixth rib in the back side of the chest. (Tr. 146.) However, the autopsy report described the wound as through and through.

Dr. Wilson observed "stippling" on Rasanen's body of "9 and a half inches from the center towards left and seven inches from up near the clavicle to near the breast region", indicating that he had been shot at a close range. (Tr. 129.) The density of the stippling was low to moderate, and Dr. Wilson testified that the density of the stippling would decrease the farther away the wound was from the muzzle of the gun. (Tr. 129–31.) Dr. Wilson further testified that the stippling from a close range shot is distinct from a "contact range" gunshot, which is where the gun is actually touching the surface of the skin when the shot is fired, and that the body lacked the requisite indications that Rasanen had been shot at contact range.

Dr. Wilson also testified that there was no observable evidence of injuries, gunshot residue, powder burns, or stippling on Rasanen's hands, forearms or upper arms. (Tr. 124.) Although Dr. Wilson recalled that there was nothing remarkable about Rasanen's hands, Dr. Wilson did not check for gun residue on Rasanen's hands or arms, nor did he place Rasanen's hands in bags to preserve potential evidence when the body was removed from the scene for further testing. Dr. Wilson admitted that it is not uncommon that victims get their hands bagged to protect them from changes during transport and to protect some residue that might be there, but that he did not order it to be done because he was not aware that there was a claim of a struggle for the gun. According to Dr. Wilson, if he had been told there was a claim that Rasanen had struggled for the gun, he would have ordered his arms and hands be placed in bags. (Tr. 155.)

Finally, although called as a cause of death expert, the Defendant's expert Dr. Lone Thanning, who is a forensic pathologist, also opined on the medical evidence. In particular, Dr. Thanning testified that, based on Dr. Wilson's autopsy report and decision not to bag Rasanen's hands for further testing, there was no evidence that Dr. Wilson examined Rasanen's hands or any way to know whether Rasanen's hands contained anything of evidentiary value.

(Tr. 785–88.) In addition, based on the stippling around the gunshot wound, Dr. Thanning identified that the shot was fired at an intermediate range between two inches and four feet from the body. (Tr. 877.)

### b. Ballistics Experts

Based on Dr. Wilson's measurements of the wound and the stippling, two ballistics experts sought to determine the distance from which the shot was fired. The first was George Krivosta, a forensic scientist at the Suffolk County Crime Laboratory in Hauppauge, New York. Krivosta performed a ballistics analysis of Brown's weapon after it was submitted to the laboratory for examination on May 20, 2002. Krivosta, testified that, based on his analysis, "the gun was fired within the bracketed distance of 9 to 18 inches". (Tr. 175.)

In addition to Krivosta, Ronald R. Scott testified for the Plaintiff as a ballistics expert. Scott performed a ballistics analysis and concluded that there was no evidence of a close struggle for the gun. (Tr. 455.) Specifically, Scott concluded that the shot was fired from more than 18 inches away. (Tr. 487.)

### c. Bullet Trajectory

At trial, the Plaintiff also offered evidence about the bullet trajectory. The Plaintiff presented the testimony of Andre Stuart of 21st Century Forensic Animations, who created an animated reconstruction of the shooting to show the trajectory of the bullet. Although a schematic of the scene had been recreated by the police at the time of the shooting, it did not contain measurements of the location of the bullets entrance or exit from the wall, or the angle that it entered the wall. (Tr. 707.) Stuart visited the residence in May of 2007 to take his own measurements. (Tr. 634.) To the extent Stuart was unable to take a measurement, and the information was not otherwise provided in the police schematic,

he made assumptions based on photographs from the crime scene. (Tr. 772.) This included assumptions about the angle that the bullet exited the common wall into the living room, the width of the wall, and the height of the bed. (Tr. 762–64, 769–73). In addition to his own measurements and assumptions, the reconstruction was also premised on: Krivosta's estimation that the gunshot range was 9 to 18 inches, (Tr. 739–41); Dr.'s Wilson's finding that the bullet went through a straight line in the body, (Tr. 741); Brown's statement that when he fired his weapon his arm was to his chest and parallel to the ground, (Tr. 740); the height and weight of Brown and Rasanen, (Tr. 742); and where Rasanen was standing in the room based on Chinnici's statement, (Tr. 770–771). Stuart testified that based on this reconstruction, the trajectory of the bullet was 72 degrees. (Tr. 731–32.)

Stuart's findings were consistent with those of Scott, the Plaintiff's ballistics expert, who in addition to testifying about the range of the shot, also testified that the trajectory of the bullet was between 72 and 78 degrees. (Tr. 529–30.) The Defendant's expert Dr. Thanning also testified on the bullet trajectory. According to Dr. Thanning, testimony that Rasanen was in motion or engaged in a struggle at the time of the shot, was consistent with the trajectory of the bullet going through Rasanen's body at a downward angle. (Tr. 800–03.)

### d. Use of Force Experts

Urey W. Patrick testified as the Defendant's use of force expert and Thomas Streed testified as the Plaintiff's use of force expert. Patrick testified that, based on the briefings he received that Rasanen was dangerous, the sudden confrontation in a dark confined space, and physical contact that results in the "redirecting the

trooper's gun in some way", Brown's use of force was reasonable and justified. (Tr. 1032–33, 1204–05.) Patrick further testified that it was reasonable that Brown did not use lesser force or retreat, and that, crediting Brown's version of events, it was reasonable to use deadly force once Brown got control of the gun. (Tr. 1205, 1029–30.)

The Plaintiff's expert, Streed, did not testify as to whether an officer would act reasonably in using deadly force based on Brown's version of events. Rather, Streed testified that Brown's use of force was unreasonable based on the initial statements that Rasanen lunged towards Brown. Under those circumstances, where an individual is lunging towards an officer and the officer is unsure whether the individual is armed, Streed testified that there is no justification for the use of deadly force. (Tr. 338, 342.) Finally, Streed testified that if an officer is faced with a target coming towards him that he knew to be dangerous, and the officer "felt his own weapon was being directed back towards him and there was evidence in support of that", then the use of lethal force would not be unreasonable. (Tr. 411.)

### 3. Deliberations and Verdict

The jury began their deliberations on the afternoon of April 27, 2011. After over five days of deliberations—which included a number of notes and a readback of Brown's testimony—on May 4, 2011, the jury sent a note to the Court indicating that they were unable to reach a verdict. The Court then gave the jury an *Allen* charge and additional time to deliberate. On May 5, 2011, the jury requested a readback of the testimony of Etherton and Chinnici. After hearing this testimony, on May 6, 2011, the jury informed the Court that it had reached a verdict. As indicated on the verdict sheet, the jury found that the Plaintiff did not prove that the constitutional rights of Rasanen were violated by the use of excessive force against him by Brown on May 17, 2002. (Tr. 2649–50.)

### D. Instant Motion

Based on a review of the Plaintiff's submissions, it appears that the Plaintiff seeks a new trial on the grounds that: (1) the jury misapplied the law and/or failed to follow instructions; (2) by crediting Brown's story of a struggle for the gun, the verdict was either against the weight of evidence, seriously erroneous, or a miscarriage of justice; and (3) even if the jury could believe a struggle for the gun, it was either against the weight of the evidence, seriously erroneous, or a miscarriage of justice to find that it was not objectively unreasonable for Brown to use deadly force because the threat had been removed.

In the alternative, based on the statements of five jurors in post-verdict conversations, the Plaintiff argues that the Court should conduct juror interviews to determine whether the jury applied the correct legal standard and permit the Plaintiff to obtain affidavits from the jurors confirming the details of the post-verdict conversations.

## II. DISCUSSION

### A. Legal Standards

#### 1. Motion for a New Trial Pursuant to Rule 59

■ Rule 59(a) of the Federal Rules of Civil Procedure provides: "A new trial may be granted … for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). "A motion for a new trial ordinarily should not be granted unless the trial court is

convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Tesser v. Bd. of Educ.*, 370 F.3d 314, 320 (2d Cir.2004); *see also Armstrong v. Brookdale Univ. Hosp.*, 425 F.3d 126, 133 (2d Cir.2005).

▮ In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp.*, 163 F.3d 124, 133–134 (2d Cir.1998); *Manley v. AmBase Corp.*, 337 F.3d 237, 246 (2d Cir. 2003) ("[A] district court may grant a new trial even where there is substantial evidence to support the jury's verdict if the court is convinced that the verdict was manifestly erroneous.") (internal quotations and citations omitted). Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.*, 163 F.3d at 134; *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir.1978). Accordingly, it is appropriate to grant a new trial where the jury's verdict is against the weight of the evidence or otherwise manifestly erroneous. *Manley*, 337 F.3d at 245.

### 2. Fourth Amendment Excessive Force Claim

▮ "The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir.2006). A police officer's use of force is excessive in violation of the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent

or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir.2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Where, as here, the officer uses deadly force, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Nimely v. City of New York*, 414 F.3d 381, 390 (2d Cir.2005) (internal quotation marks omitted); *see Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

▮ In so deciding whether an officer used excessive force, the fact finder must consider facts and circumstances of each particular case, including: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir.2010) (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865; *Jones*, 465 F.3d at 61); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation". *O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) (internal quotation marks omitted). In judging an officer's actions, the fact finder must not substitute its own viewpoint. Rather, the fact finder "must judge

the officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Jones,* 465 F.3d at 61 (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.).

### B. Motion for a New Trial or Juror Interviews Based on Juror Confusion

The Plaintiff asserts that a new trial is warranted because the jury was confused about when the use of deadly force is justified under the law. This assertion is based on hearsay reports of conversations between the Plaintiff's counsel and five jurors, an allegation that the jury charge was improper, and notes from the jurors during deliberations. In the alternative, the Plaintiff seeks leave to either obtain juror affidavits or for the Court to conduct interviews to determine whether the jurors misapplied the law.

■■ The Plaintiff's motion for a new trial based on juror confusion predominantly relies on statements by five jurors to the Plaintiff's counsel, which were allegedly made in front of the Defendant's counsel, that: (1) all nine of the jurors agreed that there was no struggle for the gun and (2) the basis for their verdict was that Rasanen did not obey the order to get down on the floor and was swaying from side-to-side. (Kutner Aff. ¶¶ 18–22; Sweeney Aff.; Persuaud Aff.) The Plaintiff asserts that these post-trial statements to counsel show that the jury instructions were either unclear or the jury misapplied the law governing excessive force claims because motion and a failure to obey orders cannot, as a matter of law, justify the use of deadly force. For their part, the Defendant's counsel does not confirm or deny that they heard the jurors make these statements, rather, the Defendant argues that these statements cannot be considered because they were obtained improperly.

■■ The Plaintiff would have this Court either accept the juror's alleged statements as true, or conduct a further inquiry into the veracity of the statements. However, what certain jurors chose to say to counsel after a lengthy and seemingly contentious deliberation is of no consequence to the Court's analysis on a motion for a new trial. The law is clear that post-verdict juror statements are inadmissible and cannot be used to impeach a verdict.

■■ "The jury's deliberations are secret and not subject to outside examination." *Yeager v. United States,* 557 U.S. 110, 129 S.Ct. 2360, 2368, 174 L.Ed.2d 78 (2009). Accordingly, Federal Rule of Evidence 606(b) provides:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed.R.Evid. 606(b)(1); *United States v. Stewart,* 433 F.3d 273, 307 (2d Cir.2006) ("[Rule] 606(b) precludes a juror from testifying about deliberations and jurors' mental processes in the course thereof."). The exceptions to this prohibition are limited to juror statements as to whether extraneous prejudicial information or an outside influence affected a jury's deliberation, or whether a mistake was made in entering the verdict on the verdict form. *See* Fed.R.Evid. 606(b)(2). However, these exceptions are not implicated by the juror statements that the Plaintiff seeks to offer. Rather, the Plaintiff seeks to intro-

duce the juror statements on their alleged misunderstanding or misapplication of the law for the purpose of impeaching the verdict, which is the type of inquiry into the deliberations and the jurors' mental processes that Rule 606(b) explicitly prohibits. *See Attridge v. Cencorp Div. of Dover Techs. Int'l, Inc.,* 836 F.2d 113, 116 (2d Cir.1987) ("Rule 606(b), therefore, by its own terms, does not extend to juror testimony on the veracity of a verdict."); *see also Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (noting that the "firmly established common-law rule in the United States flatly prohibit[s] the admission of juror testimony to impeach a jury verdict," except "in situations in which an 'extraneous influence,' [is] alleged to have affected the jury.") (quoting *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892)); *United States v. Thomas,* 116 F.3d 606, 623 (2d Cir.1997).

Indeed, even where, as allegedly occurred here, a juror explicitly states that it applied the incorrect legal standard or failed to follow instructions, the Second Circuit has held that "[s]uch evidence based on a juror's account of the jury's reasons for its verdict, even if it were not hearsay, is incompetent and cannot be received." *Woods v. Bank of New York,* 806 F.2d 368, 373 (2d Cir.1986) (internal quotation marks and citation omitted); *Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 110 (2d Cir.1985) (rejecting claim for new trial on damages that was based on juror notes taken during deliberations that purported to indicate confusion on how to apply the court's instructions governing the computation of damages); *Tatum v. Jackson,* 668 F.Supp.2d 584, 594 (S.D.N.Y. 2009) (denying a motion for a new trial based on a juror's post-verdict statement to counsel suggesting juror confusion about the knowledge element of a deliberate indifference claim); *Torres v. Costello,*

No. 97–CV–5480, 2001 WL 811924, at *14 (E.D.N.Y. June 1, 2001) (noting that courts "routinely refuse to consider juror affidavits ... claiming some misunderstanding as to the law or the consequences of a verdict") (collecting cases).

Permitting the Plaintiff to collaterally attack the verdict with the jurors' post-verdict statements "would, as the Supreme Court in *McDonald v. Pless* feared, 'make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.'" *Ohanian,* 779 F.2d at 111 (quoting *McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915)). Thus, the Court will not consider these statements in assessing whether a motion for a new trial should be granted based on juror confusion, and denies the Plaintiff's alternative request to obtain juror affidavits or for the Court to conduct interviews.

Nevertheless, the Plaintiff argues in his reply submission that the Court can consider whether the jury misapplied the law based on the juror's statements because the Defendant "has adopted the jury's erroneous test as his own alternate argument in the opposition: that a 'lunge, non-compliance, and swaying' was a permissible reason to kill [Rasanen]". (Reply Aff. ¶ 69.) This is gross mischaracterization of the Defendant's position. While the Defendant conceded in his opposition papers and at trial, that a lunge on its own would not justify the use of deadly force, the Defendant clarified that he never testified that a lunge, in conjunction with the circumstances in this case, could not justify the use of deadly force. In addition, the Defendant argued in his opposition that, even if the jury believed Rasanen "may have lunged" at him, if the jury was unclear as to what happened, the Plaintiff

failed to meet his burden. (Def.'s Br. at 20.) This is not equivalent to taking the position that a "lunge, non-compliance, and swaying", standing alone, always justifies the use of deadly force. As he did at the trial, the Defendant argued in opposition to the instant motion that "the only relevant issue is whether it was objectively reasonable—viewed from Brown's perspective—for Brown to believe that he was in imminent danger *of being shot with his own firearm*" (Def.'s Br. at 19 (emphasis added).)

Furthermore, for the first time in the reply affirmation, the Plaintiff's counsel argues that the post-verdict juror statements "conclusively prove[ ]" what was evident from juror notes during deliberations and the fact that the Court's charge did not "include any explanation as to the when the Law permits deadly physical force to be used", namely that the jury was confused about the applicable law. (Kutner Reply Aff., ¶¶ 52, 53–55, 68.) However, removing the juror's post-verdict statements from the equation, the Court finds that there is no independent basis for finding from the jury instructions or the jury notes that the jurors were confused about the applicable law.

On April 29, 2011, the day after receiving the jury charge, the jury sent a note stating: "We would like the definition of negligent and also the meaning of deadly excessive force". (Tr. 2546.) In light of the fact that the Court had dismissed the negligence claim against Brown, and there was no evidence that the shot was fired negligently, the Court instructed the jury that the shot was fired intentionally and there was "no need to instruct [them] on the definition of negligent or negligence". (Tr. 2565.) With respect to the request for a definition of "deadly excessive force", the Court decided—without objection by the Plaintiff—to repeat the excessive force charge, but to input the word "deadly" before the phrase "excessive force" in order to avoid any confusion between the meaning of "excessive force" and "deadly excessive force". (*See* Tr. 2566–2568.) The Court then stated to the jury:

> That's the best I can do as far as explaining what deadly excessive force and also eliminating, as far as negligent, in the act itself. No, there's no such evidence. It was intentional, according to Trooper Brown. The question is was it excessive, was it reasonable, under the definitions that I have given you.

(Tr. 2568.)

On May 4, 2011, the jury asked a question relating to Plaintiff's Exhibit 171, which was the section the New York State Administrative Manual ("NYSP Administrative Manual") addressing the use of deadly force. The jury asked whether, in addition to section (a), sections (c), (e), (f), and (h) of the NYSP Administrative Manual applied to the case. (Tr. 2610.) Section (a) states in relevant part:

> *Self–Defense or Defense Of Others:*
> A Member may use deadly physical force against another person when they reasonably believe it to be necessary to defend the Member or another person from the use or imminent use of deadly physical force.

(Pl.'s Ex. 171.) The guidance in the additional sections on the use of deadly physical force can be summarized as follows:

- Section (c)—circumstances under which an officer can use deadly physical force to prevent or terminate a felony in progress;
- Section (e)—where feasible and consistent with personal safety, a warning other than a shot should be used prior to using deadly physical force;
- Section (f)—where feasible and consistent with personal safety, every other

reasonable alternative should be used before using deadly physical force; and

- Section (h)—in the use of firearms each individual is solely responsible for their actions, officers are not required to retreat in lieu of using justified deadly physical force, and "deadly physical force MUST NEVER be used if a less drastic means can be used without unreasonably endangering [the officer] or another person".

(*Id.*)

The Defendant objected to the jury being permitted to consider the manual at all, but the Court found that the Defendant had waived the objection, and further that the manual was something the jury could consider. The parties agreed that section (c) was inapplicable, but disagreed as to the applicability of sections (e), (f), and (h). The Court charged the jury that sections (e), (f), and (h) were applicable.

Contrary to the Plaintiff's contention, the notes from the jury do not suggest any confusion over the applicable law or the appropriate factual inquiry. Rather, they reflect that the jury was doing precisely what it had been instructed to do, which was to assess whether a reasonable officer in Brown's position would have used deadly force against Rasanen on the morning of May 17, 2002.

Turning to those instructions, the Court finds that the jury charge on the law governing Fourth Amendment excessive force claims was clear. In fact, at the charge conference, not only did the Plaintiff fail to object to the Court's excessive force instruction, but the Plaintiff's counsel stated that he thought "the Court's charge was evenly balanced in instructing [the jury] as to the nature or the definition of excessive force under Section 1983 and the Fourth Amendment" and that "the charge was read is sufficient". (Tr. 2313.)

Regardless of whether the Plaintiff preserved this objection, the Court still finds no error in the jury charge on excessive force. The Supreme Court has held that "all claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This is precisely the standard that was charged to the jury. The fact that this case involved the use of deadly force does not require the inclusion of additional language. As the Supreme Court has noted, there is no "magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force[ ]' ", and that whether deadly force is justified in a case will turn on the reasonableness analysis as applied "to the use of a particular type of force in a particular situation". *Scott v. Harris,* 550 U.S. 372, 382, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686 (2007) (citing *Graham,* 490 U.S. at 388, 109 S.Ct. 1865, *Tennessee v. Garner,* 471 U.S. 1, 21, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

Neither for that matter is there any basis for the Court to find that the charge created confusion over the relevant factual inquiry. In addition to the various permutations of events in Brown and Chinnici's written statements, grand jury testimony, depositions, and trial testimony, the Plaintiff promulgated a theory based on the bullet trajectory which was premised on a numerous assumptions about unknown and disputed information. Taking into consideration that the jury may have chosen to credit portions of testimony from different witnesses, the number of different factual scenarios that could account for how this confrontation actually occurred was considerable. It was not the role of the Court to go through every possible set of facts and tell the jury what combination of circum-

stances could or could not justify the use of deadly force. In fact, the Second Circuit has explicitly stated that "[a] charge that a jury must find in a certain way if it should believe a certain witness, is ordinarily improper as preventing the jury from construing the evidence and determining the facts which it establishes." *Girden v. Sandals Intern.*, 262 F.3d 195, 204 (2d Cir.2001) (quoting 105 N.Y. Jur.2d Trial § 431 (1992)); *accord Weyant v. Okst,* 101 F.3d 845, 855 (2d Cir.1996) ("The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury.").

Thus, it would have been improper for the Court to charge the jury, as the Plaintiff requested after more than two days of deliberation, "[t]hat if they find that there was no struggle for the gun, that they must find for the plaintiff", (Tr. 2596) or "that in the event even if they found there was a struggle, if they found the moment he fired a gun there was no more deadly physical force, threat, toward Brown or his partner, that they must find for [the plaintiff]", (Tr. 2597). The burden in this case was on the Plaintiff to show by a preponderance of evidence that Brown's use of deadly force against Rasanen constituted excessive force under the law. If the Plaintiff could not convincingly disprove Brown's version of events; prove that Brown's account constituted excessive force; or prove a more likely account of the shooting that would not justify the use of deadly force, then, all scenarios being equal, the jury could reasonably render a verdict for the Defendant. *See United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (holding that the preponderance of the evidence standard dictates that that "when the evidence on an issue is evenly balanced, the party with the burden of proof loses"); *see, e.g., Public Adm'r of Queens County v. City of New York,* No. 06–CV–7099, 2010 WL 4457312, at *10 (S.D.N.Y. Nov. 3, 2010) ("Plaintiff's interpretations of Dr. Wetli's expert testimony only establish that the forensic evidence in isolation supports multiple interpretations of the shots fired by defendant. They do not show that Defendant's testimony regarding the shots was improbable, or that Plaintiff's *coup de grâce* theory more closely approximated the actual shots than Defendant's testimony. The evidence on this issue 'is evenly balanced,' and therefore 'the party with the burden of proof loses.'") (quoting *Gigante,* 94 F.3d at 55).

Moreover, the Court did not leave the jury without any guidance on the relevant factual inquiry. Brown explicitly testified that his basis for fearing for his life was the threat of his own gun being used against him. (Tr. 1393.) Accordingly, the Court instructed the jury that their consideration of the relevant facts should include "whether the shooting occurred during the course of [Rasanen] attacking [Brown] and trying to turn his gun against him". (Tr. 2508.) The Court further instructed the jury that one of the facts and circumstances relevant to their consideration of whether Brown's use of deadly force was reasonable was "whether the decedent was resisting and was threatening to reach the gun of the defendant, Daniel Brown". (Tr. 2509.)

The Court cannot infer from the fact that the jury returned a verdict in favor of the Defendant that the jury was confused about the applicable legal standard because the Court must assume that the jury acted in accordance with the instructions given it. *United States v. Stewart,* 433 F.3d 273, 307 (2d Cir.2006); *see also Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); *United States v. McClain,* 377 F.3d 219, 223 (2d Cir.2004); *United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002). Based on the charge, which explicitly defined the

applicable law and the relevant circumstances for consideration, and the Court's response to the jury's questions, the Court finds no basis for concluding that the jury could have been confused about the applicable legal standard. The Court twice defined the excessive force standard, and modified the standard to reference "deadly" force. Over the objection of the Defendant, the Court instructed the jury that provisions of the NYSP Administrative Manual, which provides guidance to officers on using deadly physical force were applicable to the case. In addition to the Court's instruction, section (a) of the NYSP Administrative Manual explicitly stated what the Plaintiff contends was unclear, namely that deadly physical force is only justified when an officer reasonably believes it is necessary "to defend [the officer] or another person from the use or imminent use of deadly force". (Pl.'s Ex. 171.)

This was by no means a clear-cut case for either side nor a simple task for the jury. After five and half days of deliberation, the jurors were deadlocked. After receiving an *Allen* charge, the jurors spent another day listening to the testimony of the two additional witnesses. There is no basis for the Court to find that the lengthy deliberation was the result of anything other than diligence and hard-work on the part of the jury. Accordingly, the Plaintiff's motion for a new trial on the grounds that the jury either misunderstood or misapplied the law is denied.

### C. Whether the Verdict is Against the Weight of the Evidence, Seriously Erroneous, or a Miscarriage of Justice

■ The core issue at the trial was that of the reasonableness of Brown's actions, that is, whether Brown was, by virtue of Rasanen's behavior leading up to and at the moment of the shooting, justified in employing deadly force. The Plaintiff argues that a new trial is warranted because Brown's account of any scenario where his gun could be used against him was so incredulous and against the weight of evidence that it would be a miscarriage of justice to permit the verdict to stand. The Plaintiff further argues that a new trial is warranted because, even crediting Brown's account of a struggle, the use of deadly force was not justified.

#### 1. As to Brown's Credibility

As previously stated, the burden was on the Plaintiff to prove that Brown's actions were unreasonable. Contrary to the Plaintiff's contention, the evidence presented at trial neither indisputably discredited Brown's account, nor did it conclusively prove the Plaintiff's theory. As a result, the jury's verdict rested almost entirely on credibility determinations, and whether they believed that it was more probable than not that Brown was in a position where he felt his own gun was going to be used against him.

■ "It is a well-recognized principle of our trial system that 'determining the weight and credibility of a witness's testimony .... belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men....'" *Nimely v. City of New York,* 414 F.3d 381, 397–98 (2d Cir.2005) (quoting *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891)) (alterations in original). As a result, "[a] jury's credibility assessments are entitled to deference". *United States v. Landau,* 155 F.3d 93, 104–105 (2d Cir.1998) (citing *Tennant v. Peoria & Pakin Union Ry. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944)). In *Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 875 (2d Cir.

1992), the Second Circuit held that a trial judge that disagreed with the jury's credibility assessment abused his discretion in granting a new trial, stating:

> All of the conflicting versions, if they were conflicting, were before the jury. The jurors heard both the testimony of Sorlucco on the point and that of Dr. Archibald, which tended to contradict it. They were free to settle upon which witness they believed. Under the circumstances, we think that the trial court overstepped its bounds and usurped the jury's function of judging credibility.

*Id.* This rationale is consistent with the general principle that, "where the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Landau,* 155 F.3d at 104–05; *see also id.* at 105 n. 3 ("[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.") (quoting 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, § 2806, at 74). While "these principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice . . . it will be a rare occasion on which such action is justified." *Id.* at 105 n. 4; *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998) (in deciding a Rule 59 motion for a new trial, the court "must bear in mind . . . that the court should only grant such a motion when the jury's verdict is 'egregious' " and therefore "a court should rarely disturb a jury's evaluation of a witness's credibility").

The Plaintiff relies on two cases, *Ruffin v. Fuller,* 125 F.Supp.2d 105 (S.D.N.Y. 2000) and *Busch v. City of New York,* 224 F.R.D. 81 (E.D.N.Y.2004), for the proposition that a court does not need to defer to a jury's credibility assessments of an officer in an excessive force case when doing so would result in a miscarriage of justice. However, the inquiry on a Rule 59 motion for a new trial is necessarily fact specific, and the decisions in *Ruffin* and *Busch* are distinguishable from this case in one crucial respect; namely, both decisions contained objective evidence that placed an officer's credibility in question.

In *Ruffin v. Fuller,* 125 F.Supp.2d 105 (S.D.N.Y.2000) the plaintiff, Milton Ruffin, alleged that while incarcerated, he was assaulted by three officers. According to Ruffin, after ordering him to the floor following a verbal comment, two officers held him down while the defendant officer, Van Fuller, kicked him in the face approximately three to four times, with two of the kicks landing directly in his mouth and breaking his teeth. All three officers testified that the plaintiff instigated the confrontation, admitting that they took him down to the ground to control him. However, all three officers denied that Fuller kicked Ruffin, and two of the officers speculated that Ruffin's mouth injury either occurred when he hit the floor or at some other time when he fell. Videotape surveillance existed showing some, but not all of the encounter. Following a four day trial, the jury returned a verdict finding that Fuller was not liable for using excessive force against Ruffin in violation of 42 U.S.C. § 1983. The court *sua sponte* granted a motion for a new trial pursuant to Rule 59(d) because "the jury's verdict was against the weight of the evidence presented at trial, and permitting the verdict to stand would result in a miscarriage of justice". 125 F.Supp.2d at 109.

While the court's assessment of the officer's credibility was certainly a factor in its finding that a new trial was warranted, it

was not the sole basis. Rather, the court also looked to objective evidence that contradicted the defendant's account. *Id.* at 110 ("Examining all the evidence presented at trial, *including to some extent the credibility of the witnesses,* it is clear the jury's verdict was against the weight of the evidence.") (emphasis added). Most notably, the court in *Ruffin,* found that the expert evidence "convincingly" supported the plaintiff's version of events and contradicted the officers version of events because the x-rays of his two cracked teeth showed that his injuries were "wholly consistent with multiple kicks to the mouth" and were "inconsistent ... with a fall on a flat surface". *Id.* at 109. The defendants did not contest the facts that the dental expert relied upon in making this assessment—namely that the x-rays were of the plaintiff's teeth, the teeth had been fractured in the directions indicated on the x-rays, and that the immediately adjacent teeth had not been damaged. *Id.*

Similarly, in *Busch v. City of New York,* 224 F.R.D. 81 (E.D.N.Y.2004), the decision to grant a new trial based on the officers credibility was due in part to the existence of objective evidence contradicting the officer's version of events. In *Busch,* Sgt. O'Brien, one of the officers who shot Busch testified that Busch was "very close to him when he fired" and another officer testified that "Busch was coming down on Sgt. O'Brien's head during the shooting". *Id.* at 95. However, the defendants' ballistics expert, who was also the ballistics expert in the instant case, George Krivosta, testified that Busch was five to eight feet away from the officers when he was shot, and the plaintiff's expert testified that "the absence of soot, stippling, or powder residue confirms that Busch was not shot at close range". *Id.* Sgt. O'Brien also testified that he had pepper sprayed Busch after Busch had hit him numerous times with a hammer using "baseball swings", but pictures of Sgt. O'Brien taken shortly after the incident revealed only a slight abrasion on his wrist. *Id.* Finally the court also found that the civilian eyewitness testimony that Busch fell soon after being shot was more credible than that of the officers' testimony that he continued to advance because it was supported by the expert testimony of Dr. Lone Thanning, also an expert witness in this case, that "Busch would have fallen almost immediately after his femur was shattered". *Id.*

Here, in stark contrast to *Ruffin* and *Busch,* the testimony of both eyewitnesses contained inconsistencies and there was no definitive evidence contradicting Brown's account of the incident at trial, or supporting the Plaintiff's theory, that would permit the Court to disregard the jury's credibility assessment.

The Plaintiff contends that the "most damning to the defendant, and thus most compelling of a new trial, was the fact that within minutes of the shooting, Brown confessed to five different fellow police officers of a non-deadly force threatening action by Rasanen as provoking his shooting of Rasanen". (Kutner Aff. ¶ 30.) The statements to his fellow officers include telling: (1) Trooper Etherton that "he lunged at me" (Tr. 1577, 1578; Exs. 23, 41); (2) Trooper Pidgeon that "the subject came at him" (Tr. 1664; Ex. 43); (3) Trooper Antonovich that "[Rasanen] came at him" (Tr. 1919, 1922; Exs. 16, 36); (4) Trooper Verne that "[Rasanen] raised his hands at him" (Tr. 1754–55; Ex. 44.); and (5) Lieutenant Dewar that "[Rasanen] came right at me" (Ex. 15) and "[Rasanen] came at him in an aggressive manner in close proximity with a hand raised ... [and] [Rasanen] was right on top of him" (Ex. 30). According to the Plaintiff, it was only after Brown was told to stop talking about the incident, and separated from the

rest of the officers, that ten hours later Brown mentioned a struggle for the gun in his statement.

At the trial, the Plaintiff's counsel cross-examined Brown on the alleged inconsistency and cover-up. However, Brown did not recall making these statements to his fellow officers and denied ever being told to "get a case of amnesia". (Tr. 1375.) The Defendant's counsel argued to the jury that these statements were not necessarily inconsistent and that the lack of detail in these statements was attributable to the fact that Brown had never discharged his firearm at another person (Tr. 1254), and was suffering from post-traumatic stress disorder (Def's Ex. Y). Furthermore, the Defendant's counsel disputed the assertion that Brown's statements were the result of a cover-up, noting that Streed, the Plaintiff's use of force expert, testified that it is preferable to isolate officers who were present at an officer-involved shooting. (Tr. 228–31.)

The Plaintiff also argues that Brown's testimony at trial was incredulous because it conflicted with his written statement directly following the incident and his grand jury testimony. With respect to his written statement of May 17, 2002, the Plaintiff asserts that Brown's testimony at trial conflicted with the portions of this statement where he implied a specific sequence of events and that the shot was at contact range. However, during trial, Brown resisted the Plaintiff's attempt to break down his statement into "several components", continually insisting that the confrontation took place "all at once", and that "he had to write it down somehow". (Tr. 1383, 1394.)

Furthermore, the Plaintiff contends that Brown's trial testimony conflicted with his grand jury testimony where he: (1) testified that his left arm was rigid holding his flashlight in front of him, which, given Rasanen's height, would make it impossible for Rasanen's hands or arms to reach his gun; (2) did not mention dropping the flashlight; (3) testified that Rasanen had gotten the gun away from him; and (4) testified that Rasanen was "coming forward" at him. When confronted with these alleged conflicting statements regarding the flashlight at trial, Brown testified that "locked" did not mean fully extended, and that he could not recall the precise angle his arm when he was holding Rasanen off, (Tr. 1423, 1447–49); he did not know why he had not mentioned dropping the flashlight during his grand jury testimony; and that he never said that his gun was taken away from him, only that he felt his gun being "pushed back towards [him]" (Tr. 1442, 1485, 1489). In addition, Brown clarified his grand jury testimony with respect to Rasanen's position when he approached him by saying there is a difference between leaning forward and coming forward. (Tr. 1433–34.) Brown attributed most of the inconsistencies and lack of detail to the fact that the incident happened "all at once" and "in a matter of seconds". (Tr. 1378, 1380, 1383, 1394, 1429.)

 The Court agrees with the Plaintiff that, despite Brown's attempt to parse words and avoid providing detail, Brown's trial testimony was inconsistent in several aspects from his previous statements. However, it is clearly and expressly the province of the jury, and not the judge, to assess a witness's credibility when confronted with a prior inconsistent statement. *See Kassim v. City of Schenectady,* 415 F.3d 246, 251 (2d Cir.2005) (holding that "[w]here a party has made a prior statement inconsistent with the one the party seeks to advance at trial, a question of credibility arises, which is for the jury, not the judge, to assess.") (citing Fed. R.Evid. 607, 613).

Furthermore, the fact that portions of Brown's testimony at trial were inconsistent with his previous statements does not mean that the jury was required to discredit all of Brown's testimony. *See Tolbert v. Queens College*, 242 F.3d 58, 74 (2d Cir.2001) (stating that a jury is "entitled to believe some parts and disbelieve other parts of the testimony of any given witness") (citations omitted); *Lewis v. City of New York*, 689 F.Supp.2d 417, 426 (E.D.N.Y.2010). While Brown's testimony may have been inconsistent with his prior statements on a number of details, with the exception of his purported statements to the other officers directly following the shooting, Brown has consistently stated that Rasanen attacked him and that he was in a position where he felt his own gun was going to be used against him.

The Plaintiff also contends that Brown's testimony conflicted with the account of Chinnici, the other eyewitness in the room who testified that she did not see a struggle for the gun. (Tr. 1311, 1315, 1316, 1342, 1369.) However, Chinnici's story also had a number of inconsistencies. For example, in her initial statement to the police on May 17, 2002, Chinnici stated that Rasanen approached Brown in the doorway when Brown entered the room, got down on the floor when ordered to do so, and was shot after asking if he could get up. (Pl.'s Ex. 86D.) In her grand jury testimony and at trial, Chinnici testified that Rasanen never got down on the floor, and stated that he was pacing in the middle of the room when the shot was fired. (Tr. 1336, 1344.) However, consistent with Brown's recollection, Chinnici testified that the room was dark and that it was only a matter of seconds between the time Brown entered the room and when Rasanen was shot. (Tr. 1342, 1344, 1365.)

In this case, there were only two eyewitnesses. Both agree that Rasanen was noncompliant; in motion; and immediately in front of Brown in a dark and confined room. In addition, they both agree that events unfolded in rapid, almost simultaneous succession. The one issue on which they disagreed was whether Rasanen attacked Brown. And on that issue, the jury was entitled to credit Brown's testimony.

Moreover, the physical evidence and expert testimony offered by the Plaintiff either to prove that his theory of the shooting was more probable, or to undermine Brown's credibility was either inconclusive or heavily disputed. This is largely attributable to Brown's inability to provide specific detail about his and Rasanen's respective body positions throughout the entire altercation, and the absence of evidence that may have contradicted Brown's testimony, but was not collected at the scene.

The Plaintiff attempted to show that the trajectory of the bullet, as demonstrated by a crime scene recreation, belied any possibility that the shot was fired in the course of a struggle from the doorway. However, the Defendant's experts testified that the evidence of the bullet trajectory was inconclusive and unreliable because it presumed facts that were not in the record including: the precise placement of Brown and Rasanen in the room when the shot was fired; their angle relative to each other; and to what extent Rasanen was in motion. (Tr. 532–33, 558–60, 768.)

In addition, the Defendant criticized Stuart's testimony about the trajectory of the bullet, because it was based on speculative measurements. In particular, the police schematic of Rasanen's room did not contain measurements of the location of the bullets entrance or exit from the wall, or the angle that it entered the wall, which all had to be recreated by Stuart based on photographs. (Tr. 707.) Stuart, who created the animated reconstruction, admitted that if the measurements based on his

assumptions were incorrect, it could affect his outcome of the results. (Tr. 766.) While these measurements could have produced evidence that undermined Brown's testimony, or proved that the Plaintiff's theory was more probable, neither party contends that it was Brown's responsibility to obtain them.

In *Ruffin*, the Court found that the x-rays of the plaintiff's teeth irrefutably showed that his injuries did not result from a fall, as the defendant claimed, and were more consistent with a kick, as the plaintiff claimed. 125 F.Supp.2d at 109. Here, given the number of assumptions underlying the expert testimony about the bullet trajectory, any number of which could have altered the results, the Court sees no error in the jury either crediting Brown's testimony or finding that the Plaintiff's inferences based on the bullet trajectory did not present a more plausible scenario.

Moreover, there was no consensus on the distance from which Rasanen was shot. The ballistics expert, Krivosta, identified the gunshot range as 9 to 18 inches, which would support Brown's testimony that Rasanen was at a closer range when he fired the shot. By contrast, the Plaintiff's ballistics expert, Scott, identified the gunshot range as beyond 18 inches, which, if true, would undermine Brown's account of the shot being fired within seconds of a struggle. As Scott testified, neither he nor Krivosta were able to replicate Dr. Wilson's findings in the autopsy report. In addition, on cross-examination, the defense counsel brought out that Scott's measurements on the stand differed from his previous measurements.

In *Busch,* the court noted that the testimony of Sgt. O'Brien and the testimony of another officer that Busch was very close to Sgt. O'Brien when he fired the shot conflicted with the testimony of *both*

the plaintiff and the defendant's ballistics experts, who testified that it was not a close range shot. 224 F.R.D. at 81. Here, the parties engaged in a "battle of the experts" and it is well-settled that "[t]rial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts." *In re Joint Eastern & Southern Dist. Asbestos Litigation,* 52 F.3d 1124, 1135 (2d Cir. 1995) (internal quotation marks omitted). Accordingly, the jury was entitled to credit Krivosta's testimony over Scott's, and the Court finds no basis for disturbing that determination.

The Plaintiff also contends that the physical evidence discredits Brown's testimony because Brown testified that Rasanen "fell backwards" after he was shot. (Tr. 1505–06.) Plaintiff's counsel argued to the jury in his closing arguments that it "defies all laws of physics" that Rasanen was shot during a struggle in the doorway, fell backward, and yet landed on his side or face first with his feet by the nightstand and his head at the foot of the bed. (Tr. 2410.) Again, this argument presumes the truth of disputed information, namely that Brown and Rasanen were positioned at a particular angle and location when the shot was fired, and does not account for whether Rasanen was in motion. Furthermore, while numerous troopers either testified or included in their written statements the position and location of the body, the only photograph of the body shows Rasanen after he was moved by the officers in an attempt to resuscitate him. Moreover, as the Defendant notes, plaintiff's counsel is not an expert, and failed to introduce any expert testimony as to how Rasanen's body would have fallen following a gunshot. (Def.'s Br. at 13.) While this evidence may have called into question Brown's veracity, it does not indisputably

discredit his version of events, nor does it prove that the Plaintiff's version of events is more probable.

Finally, the Plaintiff was unable to put forth any objective evidence definitively discounting Brown's claim of an attack. Although Dr. Wilson noted there was nothing of significance on Rasanen's hands and arms, no expert testified that this conclusively showed an attack had not taken place. The experts did agree that the presence or absence of gun residue on Rasanen's arms or hands was relevant in determining whether a struggle had taken place. However, this evidence was not collected, and Rasanen's hands and legs were not preserved in any manner for further testing when transported from the residence, permitting human interaction to remove potential evidence from the body. As Dr. Thanning testified:

> Without such indication, without any indication as to the body diagram, no drawings of the hands or body diagram, no verbal description in a narrative report, no bagging of the hands, no chemical testing of gun powder residue and no nail clippings and no photographs specifically honing in on the front and back and sideways, and in between the fingers of the hands, we have no way of knowing one way or the other whether, in fact, there would have been something of evidentiary value which may not have been noted or described or tested for, or all of the above.

(Tr. 788.)

Despite the Plaintiff's contention that this evidence was not collected either due to negligence or as part of a cover-up, it does not change the fact that the evidence did not exist, and, unlike in *Ruffin*, there was no adverse inference charge requested to hold Brown responsible for its absence. Rather, the jury was instructed that "inferences are not to be drawn based on

guesses, speculation or conjecture". (Tr. 2495.) Accordingly, this evidence, or the lack thereof could not have figured into the jury's deliberation in favor of either party.

Thus, unlike in *Ruffin* and *Busch*, the Court finds that there was no great weight of the evidence in either direction. Regardless of whether this Court would have reached the same conclusion, unless the weight of evidence undermines the jury's verdict, the Court should not, and will not, disturb a jury's credibility determinations.

### 2. As to Brown's Use of Deadly Force

Finally, the Plaintiff contends that, even if the jury believed that a struggle took place, a jury could not find that Brown acted in an objectively reasonable manner because Brown admitted that at the time he shot Rasanen, the gun was no longer pointed towards him. (Tr. 1491, 92.) Thus, according to the Plaintiff, at the time Brown fired the fatal shot, the threat of Rasanen using Brown's gun against him was no longer present and therefore the use of deadly physical force was objectively unreasonable.

This argument presumes as an undisputed fact that the threat against Brown was no longer present at the time he fired the shot. The law is clear is that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The mere fact that Brown had gained control of his gun, and Rasanen was unarmed did not render his use of deadly force excessive as a matter of law because the reasonableness standard allows that police officers "can have reasonable, but mistaken, beliefs" regarding the

appropriate level of force, "and in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For example, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back ... the officer would be justified in using more force than in fact was needed". *Id.* at 205, 121 S.Ct. 2151; *Carr v. Tatangelo,* 338 F.3d 1259, 1269 (11th Cir.2003) ("In a split-second, rapidly escalating situation involving perceived deadly force, coupled with his police response training, Officer Fortson acted in an objectively reasonable manner to the apparent imminent threat to his fellow officer to save his life. Officer Tatangelo's subsequent shooting of bullets that did not strike Carr or Wymbs was reaction to the same perceived threat of a gun and the chambering of bullets to protect himself. A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983.").

The relevant inquiry is whether, based on the totality of the circumstances, Brown had a reasonable perception that the threat of Rasanen using his own gun against him still existed. Here, there was testimony at the trial which, if credited, established that at the time Brown pulled the trigger, it was with the knowledge that Rasanen: (1) was a dangerous drug dealer; (2) failed to comply with his orders to "get down"; (3) attacked him in a small, dark room; and (4) was attempting to use his gun against him. Brown also testified that he did not consider himself out of danger until he fired the shot. (Tr. 1490.) In assessing the reasonableness of Brown's actions, the jury was required to weigh these circumstances against, among other factors, the disparity in size between Brown and Rasanen; Brown's considerable training in the use of defensive, non-deadly force tactics; that Rasanen had recently woken up; that Rasanen was naked from the waist up; and that Rasanen was unarmed.

Contrary to the Plaintiff's contention, whether Brown knew Rasanen was unarmed is not dispositive of whether his use of force was reasonable, but is simply one of a number of factors for consideration. Both the Defendant's use of force expert, Urey Patrick, and the Plaintiff's use of force expert, Thomas Streed, testified that, under these circumstances, where an officer reasonably believed his own gun might be used against him, it was reasonable for an officer to use deadly force. (Tr. 411, 1032–33, 1204–05.) Patrick further testified that the fact that Brown had managed to get control of the gun did not alter his conclusion that Brown's use of deadly force was reasonable, stating:

> "The situation was so close, so sudden, and so short in duration and in time, we are talking about seconds, that the best he can do under that suddenness of what he perceived to be an attack was to first get the gun turned away from himself, point it away and shoot in defense of himself. That is what he did. In my opinion that was a reasonable option under the circumstances"

(Tr. 1204–05.)

The jury was entitled to weigh these factors and find that Brown's "split-second judgment" that Rasanen, who, after failing to comply with commands, aggressively attacked Brown in a small, dark room, where his gun was being pushed back towards him, acted in a reasonable manner. *See Tracy v. Freshwater,* 623 F.3d 90, 97 (2d Cir.2010) ("In finding that such an officer would reasonably have construed Tracy's conduct as intentional and threatening, we emphasize that the events in question took place at night and during inclement weather which undoubtedly reduced visibility

and made all the more reasonable Freshwater's "split-second judgment" that Tracy's sudden movement constituted noncompliant and threatening behavior."). Thus, the Plaintiff's motion for a new trial on the ground that, even crediting Brown's account, the weight of the evidence did not justify his use of deadly force, is denied.

## III. CONCLUSION

There were two eyewitnesses to what occurred in Rasanen's room on the morning of May 17, 2002, both of whom changed aspects of their account several times in the nine years between the day of the incident and the trial. The Plaintiff's theory based on the trajectory of the bullet, was not supported by the eyewitness testimony and was premised on a number of disputed assumptions, which themselves turned on credibility assessments. With reasonable certainty, the jury could have believed it was equally likely that Rasanen attacked Brown and tried to use his gun against him; that Rasanen lunged at Brown; that Rasanen was simply pacing when Brown entered the room; or that Rasanen jumped out of bed startling Brown. It was the Plaintiff's burden to prove that is was more probable than not that what really happened in that room resulted in an unreasonable use of deadly force. The jury found that the Plaintiff failed to meet that burden.

For the foregoing reasons, it is hereby:

**ORDERED,** that the Plaintiff's motion for a new trial pursuant to Fed.R.Civ.P. 59(a) based on juror confusion is denied, and it is further

**ORDERED,** that the Plaintiff's motion to obtain juror affidavits or for the Court to conduct juror interviews is denied, and it is further

**ORDERED,** that the Plaintiff's motion for a new trial pursuant to Fed.R.Civ.P. 59(a) on the ground that the verdict is against the weight of the evidence, seriously erroneous, or a miscarriage of justice is denied, and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**